NAPH–SOL REFINING COMPANY,
Plaintiff,

v.

CITIES SERVICE OIL COMPANY and
Charles W. Duncan, Jr., Secretary of the
Department of Energy, Defendants.

No. G76–451 C.A.

United States District Court,
W. D. Michigan, S. D.

May 28, 1980.

Batzell, Nunn & Bode, Washington, D. C., Street, Stevens, Schuler, Johnson, Hipkiss, Piasecki & Knowlton, Muskegon, Mich., for plaintiff; Harold M. Street, Muskegon, Mich., William H. Bode, Washington, D. C., of counsel.

Squire, Sanders & Dempsey, Cleveland, Ohio, Mika, Meyers, Beckett & Jones, Grand Rapids, Mich., Chapman, Duff & Paul, Washington, D. C., for Cities Service; Robert C. Maynard, Cleveland, Ohio, John C. Jones, Grand Rapids, Mich., Charles S. Fax, Washington, D. C., of counsel.

Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., for Dept. of Energy.

## ON PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT

FOX, Senior District Judge.

The court hereby finds that the following material facts are without substantial controversy and are deemed established and hereby makes the following conclusions of law with respect to the motion of plaintiff for partial summary judgment declaring that defendant Cities Service Oil Company (hereinafter "Cities") has violated the Mandatory Petroleum Price Regulations, 10 C.F.R., Part 212 (hereinafter "Price Regulations"), in the manner in which it has determined the prices for motor gasoline which it has sold to plaintiff since January 1974.

*FINDINGS OF FACT*

(1) Naph-Sol Refining Company (hereinafter "Naph-Sol") is a non-branded independent marketer of motor gasoline, fuel oil and other petroleum products operating in Indiana, Michigan, Wisconsin, Minnesota, Illinois and Iowa.

(a) Naph-Sol owns and operates deepwater terminals at Muskegon, Michigan; Traverse City, Michigan; and Kewaunee, Wis-

consin, which have a combined storage capacity of approximately 60,000,000 gallons. All three terminals are capable of receiving lake tanker shipments (approximately 2,100,000 gallons); in addition, the Muskegon terminal is capable of receiving shipments by pipeline tender (1,260,000 gallons). Naph-Sol also owns and operates approximately 30 bulk plants which have an additional total storage capacity of approximately 2,000,000 gallons.

(b) Naph-Sol markets motor gasoline at both the wholesale and retail level. At the wholesale level, Naph-Sol supplies resellers and retailers of motor gasoline, including certain branded distributors of Cities. Naph-Sol also supplies motor gasoline to numerous industrial, commercial and governmental end-user accounts. At the retail level, Naph-Sol supplies approximately 200 retail service stations which use the private brand name "Zephyr."

(c) During 1972, Naph-Sol's total gasoline sales were 117,384,582 gallons.

(d) There has been no substantial change in Naph-Sol's method of operation since 1972.

(2) Cities is an integrated oil company which operates at all levels of the petroleum industry.

(a) During 1972, Cities sold Naph-Sol 38,977,529 gallons of motor gasoline pursuant to a written supply agreement executed on December 15, 1971. Naph-Sol took delivery of such product by tanker, pipeline tender and truck transport. Cities refused to renew this supply agreement when it expired on December 31, 1972.

(b) Between January 1, 1973 and March 31, 1973, Naph-Sol purchased 1,078,459 gallons of motor gasoline by truck transport from Cities' Jackson, Michigan terminal.

(c) Between June and December 1973, Cities made irregular sales of motor gasoline to Naph-Sol in truck transport quantities.

(d) Commencing in January 1974, and continuing to the present time, Cities has sold approximately 135,000,000 gallons of motor gasoline to Naph-Sol pursuant to the provisions of the Mandatory Petroleum Allocation Regulations, 10 C.F.R. Part 211 (hereinafter the "Allocation Regulations"), at the following locations by the following methods of delivery:

| Location | Method of Delivery |
| --- | --- |
| Jackson, Michigan | Truck transport |
| Niles, Michigan | Truck transport |
| Ferrysburg, Michigan | Truck transport |
| Kipling, Michigan | Truck transport |
| Green Bay, Wisconsin | Truck transport |
| Madison, Wisconsin | Truck transport |
| Milwaukee, Wisconsin | Truck transport |
| East Chicago, Indiana | Tanker and Pipeline Tender |

(3) Prior to the promulgation of the Price Regulations, Cities characterized its "reseller" customers of motor gasoline by assigning them one of five "class of business codes."

(a) These codes, which were subsequently used by Cities to identify its classes of purchaser for purposes of the Price Regulations, were as follows:

| | |
| --- | --- |
| Branded Gasoline Distributors | 080 |
| Branded Tank Car Service Stations | 082 |
| Branded Peddlers | 083 |
| Unbranded Wholesale Resellers | 090 |
| Other Refiners | 094 |

(b) The "Other Refiners" category, designated by code "094," was first established by Cities effective January 1, 1973. Prior to that time, Cities classified all of its unbranded wholesale resellers, including refiners and other large quantity purchasers, such as Naph-Sol and Osceola Refining Co. (hereinafter "Osceola"), in its general "Unbranded Wholesale Reseller" class, designated by code "090." Both of these categories were separate from the "Branded Gasoline Distributors" category, designated by code "080."

(c) Immediately before January 1, 1973, Cities reviewed its customers then classified as "Unbranded Wholesale Resellers," designated by the "090" code, and determined that a small number of those purchasers should be reclassified into the newly created "Other Refiner" category. These customers included Naph-Sol and Osceola. However, most other Cities customers formerly classified as "Unbranded Wholesale Resel-

lers" remained in that category after January 1, 1973. This was true of Tulsa Oil Company (hereinafter "Tulsa").

(4) During the period between January 1, 1973 and March 31, 1973, Cities charged Naph-Sol, Osceola and Tulsa the following prices for motor gasoline at Jackson, Michigan:

| Purchaser | Date | Prices (in cents per gallon) | |
| | | Regular | Premium |
|---|---|---|---|
| Naph-Sol | 1–31–73 to 3–31–73 | 12.92 | 14.67 |
| Tulsa | 3–15–73 to 3–31–73 | 12.70 | 14.45 |
| Osceola | effective 3–16–73 | 12.475 | 13.975 |

(5) According to Cities' original response to Naph-Sol's discovery requests, after the effective date of the Price Regulations, Cities established the following classes of purchaser for resellers at the locations from which Naph-Sol purchased motor gasoline:

Branded Distributors
Unbranded Resellers—Contract
Unbranded Resellers—Non-Contract
Inter-Refinery-Contract

(a) Prior to the promulgation of the Price Regulations, Cities had no trade group, class of trade, class of business, or class of purchaser known as or similar to the "unbranded reseller non-contract class."

(b) According to Cities' original response to Naph-Sol's discovery requests, Cities assigned Osceola to the "inter-refinery-contract" class of purchaser; Tulsa to the "unbranded-resellers-contract" class, and Naph-Sol to the "unbranded resellers-non-contract" class.

(c) This classification scheme resulted in a substantial disparity in the May 15, 1973 prices used by Cities to determine Naph-Sol's prices. The respective May 15, 1973 prices (in cents per gallon) assigned to these classes of purchaser at Jackson, Michigan were as follows:

| Inter-Refinery (Osceola) | | Unbranded Reseller Contract (Tulsa) | | Unbranded Reseller Non-Contract (Naph-Sol) | |
| Regular | Premium | Regular | Premium | Regular | Premium |
|---|---|---|---|---|---|
| 12.975 | 14.475 | 13.10 | 14.85 | 16.10 | 18.60 |

(6) Even supposing that Cities had properly identified its classes of purchaser, it devised a method for determining the May 15, 1973 prices to the "unbranded-reseller non-contract" class of purchaser in which it placed Naph-Sol which insured that Naph-Sol would be charged the same prices as its own branded distributors.

(a) In order to impute May 15, 1973 prices to the "unbranded reseller non-contract" class of purchaser, Cities examined computer listings containing only the sales between May 1 and 15, 1973.

(b) Cities therefore did not use the sales which it made to Naph-Sol at Jackson, Michigan as recently as March 31, 1973 to determine the imputed May 15, 1973 prices to the "unbranded reseller non-contract" class of purchaser.

(c) Because Cities examined only sales between May 1, and 15, 1973, it concluded that there were no sales to any member of the "unbranded reseller non-contract" class of purchaser prior to May 15, 1973 at any of the locations from which Naph-Sol purchased gasoline.

(d) Cities then examined its sales of gasoline at certain locations in Connecticut and South Carolina and concluded that there was no differential on May 15, 1973 between its selling prices to "unbranded reseller non-contract" customers and "branded distributors" at these locations.

(e) Cities then assumed that there was no differential on or immediately prior to May 15, 1973 in its selling prices to "unbranded reseller non-contract" customers and to "branded distributors" at the locations from

which Naph-Sol purchased gasoline. Based upon this conclusion, Cities used the prices which it charged to branded distributors on May 15, 1973 at the locations from which Naph-Sol purchased gasoline in order to determine the May 15, 1973 prices to the "unbranded reseller non-contract" class of purchaser in which Cities placed Naph-Sol.

(f) The May 15, 1973 prices charged to branded distributors by Cities which it used to determine Naph-Sol's prices at the various locations from which Naph-Sol purchased, and the differential with respect to Jackson, Michigan, are as follows:

| Location | May 15, 1973 Branded Distributor Prices (in cents per gallon) | | Differential vis-a-vis Jackson, Mich. |
|---|---|---|---|
| | Regular | Premium | |
| Jackson, Michigan | 16.10 | 18.60 | --- |
| Niles, Michigan | 15.85 | 18.35 | −.25 |
| Ferrysburg, Michigan | 15.85 | 18.35 | −.25 |
| Kipling, Michigan | 16.85 | 19.35 | +.75 |
| Green Bay, Wisconsin | 16.60 | 19.10 | +.50 |
| Madison, Wisconsin | 16.35 | 18.85 | +.25 |
| Milwaukee, Wisconsin | 16.20 | 18.70 | +.10 |
| East Chicago, Indiana | 15.85 | 18.35 | −.25 |

(g) With respect to unleaded gasoline, Cities determined its prices to Naph-Sol by adding one cent per gallon to the above May 15, 1973 prices for regular grade gasoline.

(7) On October 26, 1978, Cities filed amended responses to Naph-Sol's discovery requests in which Cities completely eliminated the four classes of purchaser which it previously established with respect to resellers and substituted two classes: "branded resellers" and "unbranded reseller-contract."

(a) Under this classification scheme, Naph-Sol was assigned to the "branded reseller" class. The May 15, 1973 prices to this class were identical to the prices charged to branded distributors set forth in paragraph 6(f) above.

(b) Cities also eliminated the "inter refinery-contract" and "unbranded reseller-contract" classes of purchaser in which it had previously placed Osceola and Tulsa, respectively.

(8) On July 11, 1979, Cities filed second amended responses to Naph-Sol's discovery requests, in which Cities established seven reseller classes of purchaser:

Branded Reseller

Unbranded Reseller Contract

Unbranded Reseller Noncontract

Contract Dealers With End of Month Allowances

Contract Dealers Without End of Month Allowances

Leased For Operation Dealers

Company-Operated Retail Outlets

(a) Under this classification scheme, Naph-Sol was assigned to the "unbranded reseller non-contract" class. The May 15, 1973 prices to this class were identical to the prices charged to branded distributors, set forth in paragraph 6(f) above.

(b) Osceola and Tulsa were assigned to the "unbranded reseller contract" class of purchaser. The May 15, 1973 prices to each of these companies at Jackson, Michigan were substantially identical to those set forth in paragraph 5(c) above.

(9) The "branded distributors" or "branded resellers" whose May 15, 1973 prices were used by Cities to determine its selling prices to Naph-Sol are very small businesses in relation to Naph-Sol.

(a) None of the "branded distributors" has a terminal facility. None of them is capable of storing in excess of 375,000 gallons of motor gasoline.

(b) None of the "branded distributors" is capable of taking delivery in tanker or pipeline tender quantities. None of them purchased in excess of 5,000,000 gallons of motor gasoline per year from Cities.

(c) None of the "branded distributors" operate a substantial wholesale business.

(d) All of the "branded distributors" resell motor gasoline purchased from Cities on a branded basis. As branded distributors, such firms receive free use of credit cards, the benefits of Cities advertising and promotional campaigns, and other benefits associated with the use of a commonly recognized trade name.

(10) Osceola is a non-branded independent marketer of motor gasoline and other petroleum products, operating in Michigan and other states.

(a) Osceola purchases motor gasoline from Cities and resells such product at the wholesale level.

(b) Osceola operates a refinery in West Branch, Michigan. Approximately 60% of the motor gasoline which Osceola sells is not refined by Osceola, but is purchased from two other major refiners, including Cities. Approximately 60% of the motor gasoline purchased by Osceola for resale is purchased from Cities.

(c) Osceola owns no terminals and stores approximately 200,000 gallons of gasoline at its refinery in West Branch, Michigan.

(d) Osceola does not purchase gasoline in either pipeline tender or tanker quantities. Instead, Osceola purchases in truck transport quantities ranging from 10,000 to 17,000 gallons each.

(e) Cities sold Osceola 41,442,000 gallons of motor gasoline during 1972, pursuant to a contract dated December 29, 1971, the term of which extended through December 31, 1972.

(f) In a separate agreement dated March 10, 1972, Cities agreed to extend Osceola's contract for two additional years on the same pricing basis.

(11) Tulsa is a non-branded independent marketer of motor gasoline and other petroleum products operating at the retail level in Michigan and Ohio.

(a) Tulsa does not own a terminal or any other storage facility.

(b) Tulsa does not purchase motor gasoline in either pipeline tender or tanker quantities. Instead, Tulsa purchases in truck transport quantities ranging from 12,000 to 16,000 gallons each.

(c) Cities sold Tulsa approximately 30,000,000 gallons of motor gasoline during 1972 pursuant to a contract dated March 23, 1972, the term of which extended until August 31, 1975.

*CONCLUSIONS OF LAW*

(1) The present rules applicable to the pricing of petroleum products were originally promulgated on August 19, 1973. 38 Fed.Reg. 22536 (Aug. 22, 1973), by the Cost of Living Council (hereinafter "CLC") pursuant to authority vested in it by Sections 203 and 204 of the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904, note. Pursuant to Section 4(a) of the Emergency Petroleum Allocation Act of 1973 (hereinafter "EPAA"), 15 U.S.C. § 753(a), enacted on November 27, 1973, the President was directed and authorized to promulgate regulations providing for the mandatory allocation and pricing of crude oil, residual fuel oil and refined petroleum products. In Executive Order No. 11,748, 38 Fed.Reg. 33575 (Dec. 6, 1973), the President established within his Executive Office the Federal Energy Office (hereinafter "FEO") and delegated to its Administrator all of the authority vested in the President by the EPAA. On December 26, 1973, the FEO adopted CLC's price rules for the sale of petroleum products. 39 Fed.Reg. 24 (Jan. 2, 1974). Effective January 15, 1974, the FEO promulgated the Allocation and Price Regulations. 39 Fed.Reg. 1924 (Jan. 15, 1974). The pertinent requirements of the Price Regulations have remained in effect until the present and are now administered by the Department of Energy (hereinafter "DOE").

(2) Pursuant to the Price Regulations, since August 19, 1973, Cities has been prohibited from charging to any "class of pur-

chaser" a price in excess of the "maximum allowable price" (originally the "base price"). 10 C.F.R. § 212.83(a)(1) and predecessor provisions. This term is defined in the Price Regulations as the weighted average price at which a product was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, plus allowable increased product and non-product costs. 10 C.F.R. § 212.82 and predecessor provisions. This definition establishes two basic components of the maximum lawful selling price: that portion representing the May 15, 1973 weighted average selling price for the covered product concerned, and that portion representing increases in product and non-product costs. The issues presented to the court by this motion relate solely to the first component, the propriety of Cities' determination of the May 15, 1973 weighted average selling price to the class of purchaser concerned.

(3) In order to calculate its May 15, 1973 weighted average selling prices, Cities is first required to determine its various "classes of purchaser." The term "class of purchaser" is defined as "purchasers to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers and other purchasers." 10 C.F.R. § 212.31. The term "customary price differential" is in turn defined to include "a price distinction based upon a discount, allowance, add-on, premium, and an extra based on a difference in volume, grade, quality, or location or type of purchaser, or a term or condition of sale or delivery." 10 C.F.R. § 212.31. Reading these two definitions together, it is clear that Cities is required to create separate classes of purchaser to reflect customary price differentials among purchasers that were in effect on May 15, 1973.

(4) Once the relevant class of purchaser has been identified, in order to determine the May 15, 1973 weighted average price, Cities must determine whether it had a "transaction" (as defined in 10 C.F.R. § 212.31) with such class of purchaser on May 15, 1973. In the event that no "transaction" with such class of purchaser occurred on May 15, 1973, the Price Regulations require that "the most recent day preceding May 15, 1973 when a transaction occurred shall be used for purposes of computing the maximum allowable price." 10 C.F.R. § 212.83(a)(3).

(5) In Ruling 1975–2, 40 Fed.Reg. 10,665 (March 7, 1975), the Federal Energy Administration (hereinafter "FEA"), predecessor to DOE, analyzed in depth the application of the class of purchaser doctrine. FEA stated that in determining the existence of separate and distinct classes of purchaser, what constitutes a "comparable price" charged pursuant to a "customary price differential" should begin with the regulatory definition of the latter term, which is composed of two elements. The first element refers to a "price distinction," such as "discount, allowance, add-on, premium or an extra," which may exist even though selling prices are equal. The second element refers to the "illustrative factors" which may account for such price distinctions. Apart from differences in grade or quality which did not require extended discussion, FEA stated that the remaining four factors to be applied were: (i) location; (ii) type of purchaser; (iii) volume; and (iv) term or condition of sale or delivery.

(6) When Cities resumed regular sales of motor gasoline to Naph-Sol in January 1974 pursuant to the Allocation Regulations, Cities was required to place Naph-Sol in the "most similarly situated existing class of purchaser." FEA Ruling 1974–1, 39 Fed. Reg. 3910 (Jan. 30, 1974).

■ (a) Cities violated the Price Regulations in establishing the so-called "unbranded reseller non-contract" class of purchaser because such a category did not exist for pricing or any other purposes prior to the promulgation of the Price Regulations.

(b) The relevant classes of purchaser which did customarily exist on May 15, 1973 were "unbranded wholesale resellers," denominated by Cities as code "090," "and other refiners," denominated by Cities as code "094."

(c) After the effective date of the Price Regulations, Cities recognized these classes of purchaser as, respectively, the "unbranded resellers-contract" class and the "inter-refinery-contract" class of purchaser.

■ (d) The Price Regulations prohibited Cities from placing Naph-Sol in the newly established "unbranded reseller non-contract" class of purchaser because sales of gasoline to Naph-Sol did not represent a new level of distribution for Cities. *Saber Petroleum Corp.*, 5 FEA ¶ 80,544 (Feb. 4, 1977). Instead, Cities was required "to preserve price differentials among purchasers that were customarily utilized by sellers prior to the imposition of price controls." *Champlin Petroleum Corp.*, 3 DOE ¶_____ (May 21, 1979), slip opinion at p. 35.

(7) Since the "unbranded reseller non-contract" class of purchaser did not customarily exist on May 15, 1973, Cities should have placed Naph-Sol in the most comparable class which did then exist.

(a) The most comparable classes to Naph-Sol on May 15, 1973 were the class in which Osceola was placed (the so-called "inter-refinery-contract" class) and the class in which Tulsa was placed (the so-called "unbranded-resellers-contract" class).

(b) Cities' creation of separate "contract" classes of purchase with respect to Osceola and Tulsa was not justified by any "customary price differentials" between reseller customers which purchased pursuant to contract and those which did not. Within the sixty-day period immediately prior to May 15, 1973, Cities treated Naph-Sol, Tulsa and Osceola similarly for pricing purposes despite the fact that Naph-Sol did not have a contract. The mere existence of a contract, therefore, did not form the basis for any "customary price differential" between Naph-Sol on the one hand, and Osceola and Tulsa on the other.

■ (c) In order to constitute a "customary differential," a pricing practice must be "shown to be cost-related rather than random." *Champlin Petroleum Company, supra*, slip opinion at p. 39. Although Osceola

and Tulsa purchased from Cities under contract prior to May 15, 1973 and Naph-Sol did not, this did not result in "significant cost savings by the seller." *Atlantic Richfield Co.*, 3 FEA ¶ 80,564 (1976), at p. 80,760.

(d) Because it was improper for Cities to establish the "unbranded reseller non-contract" class of purchaser, Cities should have placed Naph-Sol in the class of purchaser in which either Osceola or Tulsa was placed.

■ (8) Even if it were proper to create a separate "unbranded reseller non-contract" class of purchaser, Cities violated the Price Regulations by using transactions with the "branded distributor" class of purchaser to determine May 15, 1973 prices for the "unbranded reseller non-contract" class.

(a) The Price Regulations require that the weighted average price be computed by using only "transactions with the class of purchaser concerned." 10 C.F.R. § 212.82 (definition of "maximum allowable price").

■ (b) Cities also violated the Price Regulations by selecting only the period between May 1, 1973 and May 15, 1973 as its data base in which to search for transactions with the "unbranded reseller non-contract" class of purchaser. The Price Regulations do not prescribe any cut-off date for identifying an appropriate May 15, 1973 transaction. Instead, the Price Regulations require that the most recent day preceding May 15, 1973 when a transaction occurred is to be used for purposes of computing the maximum allowable price. 10 C.F.R. § 212.83(a)(3).

(c) If Cities had properly searched for pre-May 15, 1973 transactions with the "unbranded reseller non-contract" class of purchaser in which it placed Naph-Sol, Cities would have discovered transactions with Naph-Sol at Jackson, Michigan as late as March 31, 1973, which could have been used as the imputed May 15, 1973 transactions to such class.

■ (d) Cities also violated the Price Regulations by using sales in Connecticut and South Carolina to conclude that there was no price differential on May 15, 1973

between the "unbranded reseller non-contract" class of purchaser and the "branded distributor" class of purchaser and then transferring this conclusion to Michigan, Wisconsin and Indiana. In FEA Ruling 1975–2, *supra*, FEA stated that "location" is one of the primary factors to be used in determining the existence of a "customary price differential." DOE recently adhered to this view in *Champlin Petroleum Company, supra*, slip opinion at p. 40. 3 DOE ¶ 82,512 (Jan. 18, 1979), at p. 85,036.

(e) Naph-Sol functions at an entirely different level of distribution than do the members of the "branded distributor" class and it was contrary to the Price Regulations for Cities to use transactions with the "branded distributor" class to determine Naph-Sol's prices.

■ (9) Cities further violated the Price Regulations by attempting to alter its class of purchaser structure retroactively in its first and second amended responses to Naph-Sol's discovery requests. In *Champlin Petroleum Company, supra*, slip opinion at p. 44, DOE held that "once a seller has made a reasonable determination of its class of purchaser categories, it is bound by that selection and may not alter it to take advantage of changes in market conditions."

(10) Even if the court were to consider the merits of Cities' attempts to restructure its class of purchaser structure, the court would find each of them invalid.

(a) The classification scheme set forth in Cities' first amended discovery requests is invalid because it is clearly "outside the range of reasonable options," *Champlin Petroleum Company, supra*, slip opinion at p. 42, for Cities to place Naph-Sol in the "branded reseller" or "branded distributor" class of purchaser.

(b) The members of the "branded reseller" class of purchaser are very small businesses in relation to Naph-Sol. None of them have a terminal facility. None of them operate at the wholesale level. Most importantly, each of the branded resellers is by definition the recipient of important economic benefits resulting from its branded relationship with Cities.

(c) Naph-Sol on the other hand, is a terminal operator with a substantial wholesale business. Naph-Sol operates at an entirely different level of the industry than do "branded distributors," and Naph-Sol does so on a non-branded basis.

■ (d) In attempting to place Naph-Sol in a "branded reseller" or "branded distributor" class of purchaser, Cities failed to preserve "customary price differentials" which were in existence on or prior to May 15, 1973 between Naph-Sol and members of that class.

(e) The classification scheme set forth in Cities' first amended discovery responses is also invalid because Cities improperly excluded from consideration customary price differentials in sales of gasoline to Osceola and Tulsa on or immediately prior to May 15, 1973 which Cities was required by the Price Regulations to preserve by the establishment of separate classes of purchaser.

(f) The classification scheme set forth in Cities' second amended discovery responses is invalid for substantially the same reasons set forth in conclusions 6, 7 and 8.

■ (g) The classification scheme set forth in Cities' second amended discovery responses is also invalid because there was no cost-related reason for Cities to distinguish between Naph-Sol and either Osceola or Tulsa. Historically, Cities treated Naph-Sol, Osceola and Tulsa similarly for pricing purposes. Each of these three companies purchased in the same geographic area in large volumes, and none received the advantages of Cities' brand name, advertising, promotional activities, or credit card services. Cities' attempt to treat Naph-Sol differently than Osceola or Tulsa is clearly "outside the range of reasonable options." *Champlin Petroleum Company, supra*, slip opinion at p. 42.

■ (11) In *Champlin Petroleum Company, supra*, slip opinion at p. 42, DOE recognized that a seller "may frequently be confronted with a number of different but reasonable options for formulating its class of purchaser structure." DOE therefore

held that it would not overrule such judgment "unless it is determined that the result reached was outside the range of reasonable options." The court adopts this standard, and concludes that it was "outside the range of reasonable options" for Cities (i) to place Naph-Sol in the "unbranded reseller non-contract" class of purchaser and to determine the May 15, 1973 prices to that class of purchaser by using transactions with the "branded distributor" class of purchaser; (ii) to place Naph-Sol in the "branded reseller" class and exclude from consideration customary price differentials afforded to Osceola and Tulsa on or immediately prior to May 15, 1973; or (iii) to place Naph-Sol in a class of purchaser separate from both Osceola and Tulsa.

(12) In order to determine which class of purchaser placement of Naph-Sol was within the "range of reasonable options" available to Cities, the court will disregard labels used by Cities and examine the substantive attributes of the available classes.

(13) The court concludes that the only "reasonable" class of purchaser in which Cities could have placed Naph-Sol is the class or classes in which Cities placed Osceola and/or Tulsa.

(a) Osceola, like Naph-Sol, is an unbranded reseller of gasoline purchased from Cities. Osceola, like Naph-Sol, conducts a substantial wholesale business. Osceola, like Naph-Sol, has storage facilities. During 1972, the former "base period" under the Allocation Regulations, Osceola purchased 41.4 million gallons of gasoline from Cities, while Naph-Sol purchased 38.9 million gallons from Cities.

(b) On the other hand, although Tulsa is an unbranded reseller of gasoline which purchased comparable volumes of gasoline from Cities, Tulsa is in essence a multi-station retailer, while Naph-Sol is a terminal operator which sells at both the wholesale and retail levels. Tulsa does not have any storage facilities, while Naph-Sol has facilities for the storage of approximately 62,-000,000 gallons of petroleum products.

(c) The court therefore concludes that the "Osceola" class is the more reasonable,

because Naph-Sol is more similar to Osceola than it is to Tulsa.

(14) Because Naph-Sol should have been placed in the "Osceola" class of purchaser, Cities should have calculated its selling prices to Naph-Sol by using the May 15, 1973 transactions with Osceola at the Jackson, Michigan terminal.

(a) These May 15, 1973 prices were 12.975 cents per gallon for regular and 14.475 cents per gallon for premium.

(b) At the other terminals from which Naph-Sol has purchased gasoline from Cities, these May 15, 1973 prices should have been adjusted upward or downward to reflect the following differentials which Cities has used in determining Naph-Sol's prices since January 1974:

| Location | Differential vis-a-vis Jackson, Mich. |
| --- | --- |
| Niles, Michigan | −.25 |
| Ferrysburg, Michigan | −.25 |
| Kipling, Michigan | +.75 |
| Green Bay, Wisconsin | +.50 |
| Madison, Wisconsin | +.25 |
| Milwaukee, Wisconsin | +.10 |
| East Chicago, Indiana | −.25 |

(c) Because Cities determined its selling prices to Naph-Sol for unleaded gasoline by adding one cent per gallon to the May 15, 1973 prices for regular grade gasoline, Cities should have used a price of 13.975 cents per gallon, plus or minus the amounts set forth in subparagraph (b) above, in determining the price of unleaded gasoline which it has sold to Naph-Sol.

(15) The court therefore concludes as a matter of law that Cities has violated the Price Regulations by using improper and excessive May 15, 1973 prices in calculating its selling prices to Naph-Sol.

(a) This in and of itself has resulted in the determination by Cities of "maximum allowable prices" in excess of those permitted by the Price Regulations. *Champlin Petroleum Company, supra,* slip opinion, p. 76.

(b) While the determination of an excessive "maximum allowable price" does not *ipso facto* result in overcharges, since mar-

ket conditions may have induced Cities to sell at prices lower than the properly determined "maximum allowable price," over the long period of time involved in this action, there is a strong probability that overcharges have actually occurred. *Champlin Petroleum Company, supra,* p. 76.

(16) The court therefore determines that this action shall be scheduled for jury trial on the extent of the overcharges which have resulted from Cities' use of an excessive May 15, 1973 price with respect to Naph-Sol and whether Naph-Sol should be awarded treble damages with respect to such overcharges. It shall be deemed established as a matter of law that the proper May 15, 1973 prices which Cities should have applied with respect to Naph-Sol should be calculated in the manner described in conclusion 14.

The court is not of the opinion that an immediate appeal of this order will materially advance the ultimate termination of this litigation or that this order involves controlling questions of law as to which there is substantial ground for difference of opinion.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that plaintiff's motion for partial summary judgment declaring that defendant Cities Service Oil Company has violated the Mandatory Petroleum Price Regulations in the manner in which it has determined the prices for motor gasoline which it has sold to plaintiff since January 1974 is hereby granted.

### ON DEFENDANT CITIES SERVICE OIL COMPANY'S MOTION FOR SUMMARY JUDGMENT

The court hereby finds that the following material facts are without substantial controversy and are deemed established, and hereby makes the following conclusions of law with respect to the motion of defendant Cities Service Oil Company (hereinafter "Cities") for summary judgment.

*FINDINGS OF FACT*

(1) Naph-Sol Refining Company (hereinafter "Naph-Sol") is a non-branded independent marketer of motor gasoline, fuel oil and other petroleum products operating in Indiana, Michigan, Wisconsin, Minnesota, Illinois and Iowa.

(a) Naph-Sol owns and operates deepwater terminals at Muskegon, Michigan; Traverse City, Michigan; and Kewaunee, Wisconsin, which have a combined storage capacity of approximately 60,000,000 gallons. All three terminals are capable of receiving lake tanker shipments (approximately 2,100,000 gallons); in addition, the Muskegon terminal is capable of receiving shipments by pipeline tender (1,260,000 gallons). Naph-Sol also owns and operates approximately 30 bulk plants which have an additional total storage capacity of approximately 2,000,000 gallons.

(b) Naph-Sol markets motor gasoline at both the wholesale and retail level. At the wholesale level, Naph-Sol supplies resellers and retailers of motor gasoline, including certain branded distributors of Cities. Naph-Sol also supplies motor gasoline to numerous industrial, commercial and governmental end-user accounts. At the retail level, Naph-Sol supplies approximately 200 retail service stations which use the private brand name "Zephyr."

(c) During 1972, Naph-Sol's total gasoline sales were 117,384,582 gallons.

(d) There has been no substantial change in Naph-Sol's method of operation since 1972.

(2) Cities is an integrated oil company which operates at all levels of the petroleum industry.

(a) During 1972, Cities sold Naph-Sol 38,977,529 gallons of motor gasoline pursuant to a written supply agreement executed on December 15, 1971. Naph-Sol took delivery of such product by tanker, pipeline tender and truck transport. Cities refused to renew this supply agreement when it expired on December 31, 1972.

(b) Between January 1, 1973 and March 31, 1973, Naph-Sol purchased 1,078,459 gallons of motor gasoline by truck transport from Cities' Jackson, Michigan terminal.

(c) Between June and December 1973, Cities made irregular sales of motor gasoline to Naph-Sol in truck transport quantities.

(d) Commencing in January 1974, and continuing to the present time, Cities has sold approximately 135,000,000 gallons of motor gasoline to Naph-Sol pursuant to the provisions of the Mandatory Petroleum Allocation Regulations, 10 C.F.R. Part 211 (hereinafter the "Allocation Regulations"), at the following locations by the following methods of delivery:

| Location | Method of Delivery |
|---|---|
| Jackson, Michigan | Truck transport |
| Niles, Michigan | Truck transport |
| Ferrysburg, Michigan | Truck transport |
| Kipling, Michigan | Truck transport |
| Green Bay, Wisconsin | Truck transport |
| Madison, Wisconsin | Truck transport |
| Milwaukee, Wisconsin | Truck transport |
| East Chicago, Indiana | Tanker and Pipeline Tender |

(3) Prior to the promulgation of the Price Regulations, Cities characterized its "reseller" customers of motor gasoline by assigning them one of five "class of business codes."

(a) These codes, which were subsequently used by Cities to identify its classes of purchaser for purposes of the Price Regulations, were as follows:

| | |
|---|---|
| Branded Gasoline Distributors | 080 |
| Branded Tank Car Service Stations | 082 |
| Branded Peddlers | 083 |
| Unbranded Wholesale Resellers | 090 |
| Other Refiners | 094 |

(b) The "Other Refiners" category, designated by code "094," was first established by Cities effective January 1, 1973. Prior to that time, Cities classified all of its unbranded wholesale resellers, including refiners and other large quantity purchasers, such as Naph-Sol and Osceola Refining Co. (hereinafter "Osceola"), in its general "Unbranded Wholesale Reseller" class, designated by code "090." Both of these categories were separate from the "Branded Gasoline Distributors" category, designated by code "080."

(c) Immediately before January 1, 1973, Cities reviewed its customers then classified as "Unbranded Wholesale Resellers," designated by the "090" code, and determined that a small number of those purchasers should be reclassified into the newly created "Other Refiner" category. These customers included Naph-Sol and Osceola. However, most other Cities customers formerly classified as "Unbranded Wholesale Resellers" remained in that category after January 1, 1973. This was true of Tulsa Oil Company (hereinafter "Tulsa").

(4) During the period between January 1, 1973 and March 31, 1973, Cities charged Naph-Sol, Osceola and Tulsa the following prices for motor gasoline at Jackson, Michigan:

| Purchaser | Date | Prices (in cents per gallon) | |
|---|---|---|---|
| | | Regular | Premium |
| Naph-Sol | 1–31–73 to 3–31–73 | 12.92 | 14.67 |
| Tulsa | 3–15–73 to 3–31–73 | 12.70 | 14.45 |
| Osceola | effective 3–16–73 | 12.475 | 13.975 |

(5) According to Cities' original response to Naph-Sol's discovery requests, after the effective date of the Price Regulations Cities established the following classes of purchaser for resellers at the locations from which Naph-Sol purchased motor gasoline:

Branded Distributors

Unbranded Resellers—Contract

Unbranded Resellers—Non-Contract

Inter-Refinery-Contract

(a) Prior to the promulgation of the Price Regulations, Cities had no trade group, class of trade, class of business, or class of purchaser known as or similar to the "unbranded reseller non-contract class."

(b) According to Cities' original response to Naph-Sol's discovery requests, Cities assigned Osceola to the "inter-refinery-contract" class of purchaser; Tulsa to the "unbranded-resellers-contract" class, and Naph-Sol to the "unbranded resellers-non-contract" class.

(c) This classification scheme resulted in a substantial disparity in the May 15, 1973 prices used by Cities to determine Naph-

Sol's prices. The respective May 15, 1973 prices (in cents per gallon) assigned to these classes of purchaser at Jackson, Michigan were as follows:

| Inter-Refinery (Osceola) | | Unbranded Reseller Contract (Tulsa) | | Unbranded Reseller Non-Contract (Naph-Sol) | |
|---|---|---|---|---|---|
| Regular | Premium | Regular | Premium | Regular | Premium |
| 12.975 | 14.475 | 13.10 | 14.85 | 16.10 | 18.60 |

(6) Even supposing that Cities had properly identified its classes of purchaser, it devised a method for determining the May 15, 1973 prices to the "unbranded reseller non-contract" class of purchaser in which it placed Naph-Sol which insured that Naph-Sol would be charged the same prices as its own branded distributors.

(a) In order to impute May 15, 1973 prices to the "unbranded reseller non-contract" class of purchaser, Cities examined computer listings containing only the sales between May 1 and 15, 1973.

(b) Cities therefore did not use the sales which it made to Naph-Sol at Jackson, Michigan as recently as March 31, 1973 to determine the imputed May 15, 1973 prices to the "unbranded reseller non-contract" class of purchaser.

(c) Because Cities examined only sales between May 1, and 15, 1973, it concluded that there were no sales to any member of the (unbranded reseller non-contract" class of purchaser prior to May 15, 1973 at any of the locations from which Naph-Sol purchased gasoline.

(d) Cities then examined its sales of gasoline at certain locations in Connecticut and South Carolina and concluded that there was no differential on May 15, 1973 between its selling prices to "unbranded reseller non-contract" customers and "branded distributors" at these locations.

(e) Cities then assumed that there was no differential on or immediately prior to May 15, 1973 in its selling prices to "unbranded reseller non-contract" customers and to "branded distributors" at the locations from which Naph-Sol purchased gasoline. Based upon this conclusion, Cities used the prices which it charged to branded distributors on May 15, 1973 at the locations from which Naph-Sol purchased gasoline in order to determine the May 15, 1973 prices to the "unbranded reseller non-contract" class of purchaser in which Cities placed Naph-Sol.

(f) The May 15, 1973 prices charged to branded distributors by Cities which it used to determine Naph-Sol's prices at the various locations from which Naph-Sol purchased, and the differential with respect to Jackson, Michigan, are as follows:

| Location | May 15, 1973 Branded Distributor Prices (in cents per gallon) | | Differential vis-a-vis Jackson, Mich. |
|---|---|---|---|
| | Regular | Premium | |
| Jackson, Michigan | 16.10 | 18.60 | --- |
| Niles, Michigan | 15.85 | 18.35 | −.25 |
| Ferrysburg, Michigan | 15.85 | 18.35 | −.25 |
| Kipling, Michigan | 16.85 | 19.35 | +.75 |
| Green Bay, Wisconsin | 16.60 | 19.10 | +.50 |
| Madison, Wisconsin | 16.35 | 18.85 | +.25 |
| Milwaukee, Wisconsin | 16.20 | 18.70 | +.10 |
| East Chicago, Indiana | 15.85 | 18.35 | −.25 |

(g) With respect to unleaded gasoline, Cities determined its prices to Naph-Sol by adding one cent per gallon to the above May 15, 1973 prices for regular grade gasoline.

(7) On October 26, 1978, Cities filed amended responses to Naph-Sol's discovery requests in which Cities completely eliminated the four classes of purchaser which it previously established with respect to resellers and substituted two classes: "branded resellers" and "unbranded reseller-contract."

(a) Under this classification scheme, Naph-Sol was assigned to the "branded reseller" class. The May 15, 1973 prices to this class were identical to the prices charged to branded distributors set forth in paragraph 6(f) above.

(b) Cities also eliminated the "inter refinery-contract" and "unbranded reseller-contract" classes of purchaser in which it had previously placed Osceola and Tulsa, respectively.

(8) On July 11, 1979, Cities filed second amended responses to Naph-Sol's discovery requests, in which Cities established seven reseller classes of purchaser:

Branded Reseller

Unbranded Reseller Contract

Unbranded Reseller Noncontract

Contract Dealers With End of Month Allowances

Contract Dealers Without End of Month Allowances

Leased For Operation Dealers

Company-Operated Retail Outlets

(a) Under this classification scheme, Naph-Sol was assigned to the "unbranded reseller non-contract" class. The May 15, 1973 prices to this class were identical to the prices charged to branded distributors, set forth in paragraph 6(f) above.

(b) Osceola and Tulsa were assigned to the "unbranded reseller contract" class of purchaser. The May 15, 1973 prices to each of these companies at Jackson, Michigan were substantially identical to those set forth in paragraph 5(c) above.

(9) The "branded distributors" or "branded resellers" whose May 15, 1973 prices were used by Cities to determine its selling prices to Naph-Sol are very small businesses in relation to Naph-Sol.

(a) None of the "branded distributors" has a terminal facility. None of them is capable of storing in excess of 375,000 gallons of motor gasoline.

(b) None of the "branded distributors" is capable of taking delivery in tanker or pipeline tender quantities. None of them purchased in excess of 5,000,000 gallons of motor gasoline per year from Cities.

(c) None of the "branded distributors" operate a substantial wholesale business.

(d) All of the "branded distributors" resell motor gasoline purchased from Cities on a branded basis. As branded distributors, such firms receive free use of credit cards, the benefits of Cities advertising and promotional campaigns, and other benefits associated with the use of a commonly recognized trade name.

(10) Osceola is a non-branded independent marketer of motor gasoline and other petroleum products, operating in Michigan and other states.

(a) Osceola purchases motor gasoline from Cities and resells such product at the wholesale level.

(b) Osceola operates a refinery in West Branch, Michigan. Approximately 60% of the motor gasoline which Osceola sells is not refined by Osceola, but is purchased from two other major refiners, including Cities. Approximately 60% of the motor gasoline purchased by Osceola for resale is purchased from Cities.

(c) Osceola owns no terminals and stores approximately 200,000 gallons of gasoline at its refinery in West Branch, Michigan.

(d) Osceola does not purchase gasoline in either pipeline tender or tanker quantities. Instead, Osceola purchases in truck transport quantities ranging from 10,000 to 17,000 gallons each.

(e) Cities sold Osceola 41,442,000 gallons of motor gasoline during 1972, pursuant to

a contract dated December 29, 1971, the term of which extended through December 31, 1972.

(f) In a separate agreement dated March 10, 1972, Cities agreed to extend Osceola's contract for two additional years on the same pricing basis.

(11) Tulsa is a non-branded independent marketer of motor gasoline and other petroleum products operating at the retail level in Michigan and Ohio.

(a) Tulsa does not own a terminal or any other storage facility.

(b) Tulsa does not purchase motor gasoline in either pipeline tender or tanker quantities. Instead, Tulsa purchases in truck transport quantities ranging from 12,000 to 16,000 gallons each.

(c) Cities sold Tulsa approximately 30,000,000 gallons of motor gasoline during 1972 pursuant to a contract dated March 23, 1972, the term of which extended until August 31, 1975.

(12) On January 6, 1976, G. G. Tobleck and R. J. Weerstra, then vice presidents of Naph-Sol, met at Cities' head offices in Tulsa, Oklahoma with J. H. Oltmann, J. H. Dewell and R. R. Morgan of Cities.

(a) During the course of this meeting, Naph-Sol charged that Cities had improperly determined Naph-Sol's prices. Naph-Sol also stated that it believed that Cities had charged Osceola substantially lower prices than Naph-Sol.

(b) According to a contemporaneous memorandum prepared by Mr. Morgan of Cities, Naph-Sol sought "to obtain from Cities a more favorable pricing arrangement," and Naph-Sol stated "that litigation was a possibility."

(c) On January 16, 1976, Mr. Tobleck wrote to Mr. Oltmann to follow up on the meeting. Mr. Tobleck's letter specifically referred to the pricing disparity between Naph-Sol and Osceola. Mr. Tobleck further advised Mr. Oltmann that Naph-Sol was "awaiting official word from you concerning our next course of action."

(d) On January 23, 1976, Mr. Oltmann responded to Mr. Tobleck's letter by stating that "our current pricing on sales to Naph-Sol Refining Company is proper." With respect to the disparity between the prices charged by Cities to Naph-Sol and to Osceola, Mr. Oltmann stated that "our pricing to other customers is not a proper subject of mutual agreement or even discussion with you."

(e) In a deposition taken in this action, Mr. Oltmann testified in substance that upon receipt of Mr. Tobleck's letter he consulted with appropriate account representatives and members of Cities' pricing and legal departments, and that if Cities had determined that the prices charged by it to Naph-Sol were improper, he would have recommended that refunds be made.

(13) This action was commenced on September 15, 1976.

*CONCLUSIONS OF LAW*

(1) The present rules applicable to the pricing of petroleum products were originally promulgated on August 19, 1973. 38 Fed.Reg. 22536 (Aug. 22, 1973), by the Cost of Living Council (hereinafter "CLC") pursuant to authority vested in it by Sections 203 and 204 of the Economic Stabilization Act of 1970, as amended, 12 U.S.C. § 1904, note. Pursuant to Section 4(a) of the Emergency Petroleum Allocation Act of 1973 (hereinafter "EPAA"), 15 U.S.C. § 753(a), enacted on November 27, 1973, the President was directed and authorized to promulgate regulations providing for the mandatory allocation and pricing of crude oil, residual fuel oil and refined petroleum products. In Executive Order No. 11,748, 38 Fed.Reg. 33575 (Dec. 6, 1973), the President established within his Executive Office the Federal Energy Office (hereinafter "FEO") and delegated to its Administrator all of the authority vested in the President by the EPAA. On December 26, 1973, the FEO adopted CLC's price rules for the sale of petroleum products. 39 Fed.Reg. 24 (Jan. 2, 1974). Effective January 15, 1974, the FEO promulgated the Allocation and Price Regulations. 39 Fed.Reg. 1924 (Jan. 15, 1974). The pertinent requirements of

the Price Regulations have remained in effect until the present and are now administered by the Department of Energy (hereinafter "DOE").

(2) Pursuant to the Price Regulations, since August 19, 1973, Cities has been prohibited from charging to any "class of purchaser" a price in excess of the "maximum allowable price" (originally the "base price"). 10 C.F.R. § 212.83(a)(1) and predecessor provisions. This term is defined in the Price Regulations as the weighted average price at which a product was lawfully priced in transactions with the class of purchaser concerned on May 15, 1973, plus allowable increased product and non-product costs. 10 C.F.R. § 212.82 and predecessor provisions. This definition establishes two basic components of the maximum lawful selling price: that portion representing the May 15, 1973 weighted average selling price for the covered product concerned, and that portion representing increases in product and non-product costs. The issues presented to the court by this motion relate solely to the first component, the propriety of Cities' determination of the May 15, 1973 weighted average selling price to the class of purchaser concerned.

(3) In order to calculate its May 15, 1973 weighted average selling prices, Cities is first required to determine its various "classes of purchaser." The term "class of purchaser" is defined as "purchasers to whom a person has charged a comparable price for comparable property or service pursuant to customary price differentials between those purchasers and other purchasers." 10 C.F.R. § 212.31. The term "customary price differential" is in turn defined to include "a price distinction based upon a discount, allowance, add-on, premium, and an extra based on a difference in volume, grade, quality, or location or type of purchaser, or a term or condition of sale or delivery." 10 C.F.R. § 212.31. Reading these two definitions together, it is clear that Cities is required to create separate classes of purchaser to reflect customary price differentials among purchasers that were in effect on May 15, 1973.

(4) Once the relevant class of purchaser has been identified, in order to determine the May 15, 1973 weighted average price, Cities must determine whether it had a "transaction" (as defined in 10 C.F.R. § 212.31) with such class of purchaser on May 15, 1973. In the event that no "transaction" with such class of purchaser occurred on May 15, 1973, the Price Regulations require that "the most recent day preceding May 15, 1973 when a transaction occurred shall be used for purposes of computing the maximum allowable price." 10 C.F.R. § 212.83(a)(3).

(5) In Ruling 1975–2, 40 Fed.Reg. 10,665 (March 7, 1975), the Federal Energy Administration (hereinafter "FEA"), predecessor to DOE, analyzed in depth the application of the class of purchaser doctrine. FEA stated that in determining the existence of separate and distinct classes of purchaser, what constitutes a "comparable price" charged pursuant to a "customary price differential" should begin with the regulatory definition of the latter term, which is composed of two elements. The first element refers to a "price distinction," such as "discount, allowance, add-on, premium or an extra," which may exist even though selling prices are equal. The second element refers to the "illustrative factors" which may account for such price distinctions. Apart from differences in grade or quality, which did not require extended discussion, FEA stated that the remaining four factors to be applied were: (i) location; (ii) type of purchaser; (iii) volume; and (iv) term or condition of sale or delivery.

(6) When Cities resumed regular sales of motor gasoline to Naph-Sol in January 1974 pursuant to the Allocation Regulations, Cities was required to place Naph-Sol in the "most similarly situated existing class of purchaser." FEA Ruling 1974–1, 39 Fed. Reg. 3910 (Jan. 30, 1974).

(a) Cities violated the Price Regulations in establishing the so-called "unbranded reseller non-contract" class of purchaser because such a category did not exist for pricing or any other purposes prior to the promulgation of the Price Regulations.

(b) The relevant classes of purchaser which did customarily exist on May 15, 1973 were "unbranded wholesale resellers," denominated by Cities as code "090," and "other refiners," denominated by Cities as code "094."

(c) After the effective date of the Price Regulations, Cities recognized these classes of purchaser as, respectively, the "unbranded resellers-contract" class and the "inter-refinery-contract" class of purchaser.

(d) The Price Regulations prohibited Cities from placing Naph-Sol in the newly established "unbranded reseller non-contract" class of purchaser because sales of gasoline to Naph-Sol did not represent a new level of distribution for Cities. *Saber Petroleum Corp.*, 5 FEA ¶ 80,544 (Feb. 4, 1977). Instead, Cities was required "to preserve price differentials among purchasers that were customarily utilized by sellers prior to the imposition of price controls." *Champlin Petroleum Corp.*, 3 DOE ¶ _____ (May 21, 1979), slip opinion at p. 35.

(7) Since the "unbranded reseller non-contract" class of purchaser did not customarily exist on May 15, 1973, Cities should have placed Naph-Sol in the most comparable class which did then exist.

(a) The most comparable classes to Naph-Sol on May 15, 1973 were the class in which Osceola was placed (the so-called "inter-refinery-contract" class) and the class in which Tulsa was placed (the so-called "unbranded-resellers-contract" class).

(b) Cities' creation of separate "contract" classes of purchase with respect to Osceola and Tulsa was not justified by any "customary price differentials" between reseller customers which purchased pursuant to contract and those which did not. Within the sixty-day period immediately prior to May 15, 1973, Cities treated Naph-Sol, Tulsa and Osceola similarly for pricing purposes despite the fact that Naph-Sol did not have a contract. The mere existence of a contract, therefore, did not form the basis for any "customary price differential" between Naph-Sol on the one hand, and Osceola and Tulsa on the other.

(c) In order to constitute a "customary differential," a pricing practice must be "shown to be cost-related rather than random." *Champlin Petroleum Company, supra*, slip opinion at p. 39. Although Osceola and Tulsa purchased from Cities under contract prior to May 15, 1973 and Naph-Sol did not, this did not result in "significant cost savings by the seller." *Atlantic Richfield Co.*, 3 FEA ¶ 80,564 (1976), at p. 80,760.

(d) Because it was improper for Cities to establish the "unbranded reseller non-contract" class of purchaser, Cities should have placed Naph-Sol in the class of purchaser in which either Osceola or Tulsa was placed.

(8) Even if it were proper to create a separate "unbranded reseller non-contract" class of purchaser, Cities violated the Price Regulations by using transactions with the "branded distributor" class of purchaser to determine May 15, 1973 prices for the "unbranded reseller non-contract" class.

(a) The Price Regulations require that the weighted average price be computed by using only "transactions with the class of purchaser concerned." 10 C.F.R. § 212.82 (definition of "maximum allowable price").

(b) Cities also violated the Price Regulations by selecting only the period between May 1, 1973 and May 15, 1973 as its data base in which to search for transactions with the "unbranded reseller non-contract" class of purchaser. The Price Regulations do not prescribe any cut-off date for identifying an appropriate May 15, 1973 transaction. Instead, the Price Regulations require that the most recent day preceding May 15, 1973 when a transaction occurred is to be used for purposes of computing the maximum allowable price. 10 C.F.R. § 212.83(a)(3).

(c) If Cities had properly searched for pre-May 15, 1973 transactions with the "unbranded reseller non-contract" class of purchaser in which it placed Naph-Sol, Cities would have discovered transactions with Naph-Sol at Jackson, Michigan as late as March 31, 1973, which could have been used as the imputed May 15, 1973 transactions to such class.

(d) Cities also violated the Price Regulations by using sales in Connecticut and South Carolina to conclude that there was no price differential on May 15, 1973 between the "unbranded reseller non-contract" class of purchaser and the "branded distributor" class of purchaser and then transferring this conclusion to Michigan, Wisconsin and Indiana. In FEA Ruling 1975–2, *supra*, FEA stated that "location" is one of the primary factors to be used in determining the existence of a "customary price differential." DOE recently adhered to this view in *Champlin Petroleum Company, supra*, slip opinion at p. 40. 3 DOE ¶ 82,512 (Jan. 18, 1979), at p. 85,036.

(e) Naph-Sol functions at an entirely different level of distribution than do the members of the "branded distributor" class and it was contrary to the Price Regulations for Cities to use transactions with the "branded distributor" class to determine Naph-Sol's prices.

(9) Cities further violated the Price Regulations by attempting to alter its class of purchaser structure retroactively in its first and second amended responses to Naph-Sol's discovery requests. In *Champlin Petroleum Company, supra*, slip opinion at p. 44, DOE held that "once a seller has made a reasonable determination of its class of purchaser categories, it is bound by that selection and may not alter it to take advantage of changes in market conditions."

(10) Even if the court were to consider the merits of Cities' attempts to restructure its class of purchaser structure, the court would find each of them invalid.

(a) The classification scheme set forth in Cities' first amended discovery requests is invalid because it is clearly "outside the range of reasonable options," *Champlin Petroleum Company, supra*, slip opinion at p. 42, for Cities to place Naph-Sol in the "branded reseller" or "branded distributor" class of purchaser.

(b) The members of the "branded reseller" class of purchaser are very small businesses in relation to Naph-Sol. None of them have a terminal facility. None of them operate at the wholesale level. Most

importantly, each of the branded resellers is by definition the recipient of important economic benefits resulting from its branded relationship with Cities.

(c) Naph-Sol on the other hand, is a terminal operator with a substantial wholesale business. Naph-Sol operates at an entirely different level of the industry than do "branded distributors," and Naph-Sol does so on a non-branded basis.

(d) In attempting to place Naph-Sol in a "branded reseller" or "branded distributor" class of purchaser, Cities failed to preserve "customary price differentials" which were in existence on or prior to May 15, 1973 between Naph-Sol and members of that class.

(e) The classification scheme set forth in Cities' first amended discovery responses is also invalid because Cities improperly excluded from consideration customary price differentials in sales of gasoline to Osceola and Tulsa on or immediately prior to May 15, 1973 which Cities was required by the Price Regulations to preserve by the establishment of separate classes of purchaser.

(f) The classification scheme set forth in Cities' second amended discovery responses is invalid for substantially the same reasons set forth in conclusions 6, 7 and 8.

(g) The classification scheme set forth in Cities' second amended discovery responses is also invalid because there was no cost-related reason for Cities to distinguish between Naph-Sol and either Osceola or Tulsa. Historically, Cities treated Naph-Sol, Osceola and Tulsa similarly for pricing purposes. Each of these three companies purchased in the same geographic area in large volumes, and none received the advantages of Cities' brand name, advertising, promotional activities, or credit card services. Cities' attempt to treat Naph-Sol differently than Osceola or Tulsa is clearly "outside the range of reasonable options." *Champlin Petroleum Company, supra*, slip opinion at p. 42.

(11) In *Champlin Petroleum Company, supra*, slip opinion at p. 42, DOE recognized that a seller "may frequently be confronted

with a number of different but reasonable options for formulating its class of purchaser structure." DOE therefore held that it would not overrule such judgment "unless it is determined that the result reached was outside the range of reasonable options." The court adopts this standard, and concludes that it was "outside the range of reasonable options" for Cities (i) to place Naph-Sol in the "unbranded reseller non-contract" class of purchaser and to determine the May 15, 1973 prices to that class of purchaser by using transactions with the "branded distributor" class of purchaser; (ii) to place Naph-Sol in the "branded reseller" class and exclude from consideration customary price differentials afforded to Osceola and Tulsa on or immediately prior to May 15, 1973; or (iii) to place Naph-Sol in a class of purchaser separate from both Osceola and Tulsa.

(12) In order to determine which class of purchaser placement of Naph-Sol was within the "range of reasonable options" available to Cities, the court will disregard labels used by Cities and examine the substantive attributes of the available classes.

(13) The court concludes that the only "reasonable" class of purchaser in which Cities could have placed Naph-Sol is the class or classes in which Cities placed Osceola and/or Tulsa.

(a) Osceola, like Naph-Sol, is an unbranded reseller of gasoline purchased from Cities. Osceola, like Naph-Sol, conducts a substantial wholesale business. Osceola, like Naph-Sol, has storage facilities. During 1972, the former "base period" under the Allocation Regulations, Osceola purchased 41.4 million gallons of gasoline from Cities, while Naph-Sol purchased 38.9 million gallons from Cities.

(b) On the other hand, although Tulsa is an unbranded reseller of gasoline which purchased comparable volumes of gasoline from Cities, Tulsa is in essence a multi-station retailer, while Naph-Sol is a terminal operator which sells at both the wholesale and retail levels. Tulsa does not have any storage facilities, while Naph-Sol has facilities for the storage of approximately 62,-000,000 gallons of petroleum products.

(c) The court therefore concludes that the "Osceola" class is the more reasonable, because Naph-Sol is more similar to Osceola than it is to Tulsa.

(14) Because Naph-Sol should have been placed in the "Osceola" class of purchaser, Cities should have calculated its selling prices to Naph-Sol by using the May 15, 1973 transactions with Osceola at the Jackson, Michigan terminal.

(a) These May 15, 1973 prices were 12.975 cents per gallon for regular and 14.475 cents per gallon for premium.

(b) At the other terminals from which Naph-Sol has purchased gasoline from Cities, these May 15, 1973 prices should have been adjusted upward or downward to reflect the following differentials which Cities has used in determining Naph-Sol's prices since January 1974:

| Location | Differential vis-a-vis Jackson, Mich. |
|---|---|
| Niles, Michigan | – .25 |
| Ferrysburg, Michigan | – .25 |
| Kipling, Michigan | + .75 |
| Green Bay, Wisconsin | + .50 |
| Madison, Wisconsin | + .25 |
| Milwaukee, Wisconsin | + .10 |
| East Chicago, Indiana | – .25 |

(c) Because Cities determined its selling prices to Naph-Sol for unleaded gasoline by adding one cent per gallon to the May 15, 1973 prices for regular grade gasoline, Cities should have used a price of 13.975 cents per gallon, plus or minus the amounts set forth in subparagraph (b) above, in determining the price of unleaded gasoline which it has sold to Naph-Sol.

(15) The court therefore concludes as a matter of law that Cities has violated the Price Regulations by using improper and excessive May 15, 1973 prices in calculating its selling prices to Naph-Sol.

(a) This in and of itself has resulted in the determination by Cities of "maximum allowable prices" in excess of those permitted by the Price Regulations. *Champlin Petroleum Company, supra,* slip opinion, p. 76.

(b) While the determination of an excessive "maximum allowable price" does not *ipso facto* result in overcharges, since market conditions may have induced Cities to sell at prices lower than the properly determined "maximum allowable price," over the long period of time involved in this action, there is a strong probability that overcharges have actually occurred. *Champlin Petroleum Company, supra,* p. 76.

(c) Cities' contention that mere proof of improper classification is not sufficient to constitute a triable issue of fact as to damages is without merit.

(d) Cities' contention that it is entitled to summary judgment because Naph-Sol has failed to show the existence of overcharges is therefore without merit.

(16) Section 210 of the Economic Stabilization Act requires that where an overcharge is "not willful," no action to recover such an overcharge may be brought unless the aggrieved party has first presented to the seller a bona fide claim for refund and has not received repayment within ninety days from the presentation of such claim. *Longview Refining Co. v. Shore,* 554 F.2d 1006 (Em.App.1977), *cert. denied,* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1978).

(a) There is no requirement that the "bona fide claim for refund" be written or that it be in any particular form.

(b) At the meeting in Tulsa on January 6, 1976, and in its vice president's letter dated January 16, 1976, Naph-Sol presented Cities with a "bona fide claim for refund" of the overcharges. Cities regarded the meeting and the letter as having set forth such a claim, and rejected it in its letter of January 23, 1976. This action was commenced more than ninety days thereafter.

(c) The court therefore concludes as a matter of law that Naph-Sol has satisfied the statutory prerequisite of presentation of a bona fide claim for refund at least ninety days prior to the commencement of this action.

(d) Even if the requirement of a "bona fide claim for refund" had not been met, the court would conclude, as a matter of law, that this action has been properly brought because Cities' violations of the Price Regulations with respect to Naph-Sol constitute "willful" conduct, as that term has been interpreted, *Longview Refining Co. v. Shore, supra,* at 1012–14.

(e) Cities' contention that it is entitled to summary judgment because Naph-Sol has failed to show willfulness is therefore without merit.

(17) Section 210(b) of the Economic Stabilization Act provides that in an overcharge action, the court in its discretion may award the plaintiff reasonable attorneys' fees and costs, plus an amount not more than three times the amount of the overcharge upon which the action is based. The statute further provides that "where the defendant establishes that the overcharge was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error the liability of the defendant shall be limited to the amount of the overcharge."

(a) The statutory scheme clearly places the burden of proof on Cities to offer sufficient evidence to meet the standard of conduct necessary to avoid the imposition of treble damages.

(b) The court concludes that Cities has failed to show that the evidence is susceptible only to the legal conclusion that its conduct met the statutory standard required to avoid the imposition of treble damages.

(c) On the contrary, there is ample evidence which would entitle the trier of fact to conclude that Cities' conduct was "intentional" and was not the result of "a bona fide error notwithstanding the maintenance of procedures reasonably adapted to the avoidance of such error." Such evidence includes the following:

(i) Cities refused to continue the historic pricing similarity among Naph-Sol, Osceola and Tulsa, reflected in Cities, cus-

tomer codes, revised recently before the Regulations were promulgated.

(ii) Cities refused to preserve customary price differentials between Naph-Sol and "branded distributors."

(iii) Cities placed Naph-Sol in a legally spurious class of purchaser known as "unbranded resellers-non-contract."

(iv) Cities uses fictitious transactions in the Northeast and the South to determine its prices to Naph-Sol in the Upper Midwest.

(v) After the close of discovery in this case, and when faced with Naph-Sol's motion for partial summary judgment, Cities attempted to rearrange its classes of purchaser so as to wipe out the "Osceola" and "Tulsa" classes, in which Naph-Sol contended it belonged.

(vi) As part of this scheme, Cities attempted to structure its classes of purchaser in such a manner as to conceal the fact that on or immediately before May 15, 1973, both Osceola and Tulsa were charged lower prices than were branded distributors.

(vii) As a further part of this scheme, Cities attempted to charge Naph-Sol the same prices that Cities charged to substantially dissimilar customers.

(viii) Cities attempted to obtain DOE's approval of a class of purchaser scheme which would ratify Cities' pricing basis with respect to Naph-Sol.

(d) Cities' contention that it is entitled to summary judgment because Naph-Sol has failed to show the existence of conduct warranting the imposition of treble damages is therefore without merit.

(18) The court therefore determines that this action shall be scheduled for jury trial on the extent of the overcharges which have resulted from Cities' use of an excessive May 15, 1973 price with respect to Naph-Sol and whether Naph-Sol should be awarded treble damages with respect to such overcharges. It shall be deemed established as a matter of law that the proper May 15, 1973 prices which Cities should have applied with respect to Naph-Sol should be calculated in the manner described in conclusion 14 and that prior to the institution of this action, Naph-Sol presented a bona fide claim for refund to Cities and did not receive repayment within ninety days thereof.

The court is not of the opinion that an immediate appeal of this order will materially advance the ultimate termination of this litigation or that this order involves controlling questions of law as to which there is substantial ground for difference of opinion.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the motion of Cities Service Oil Company for summary judgment is hereby denied.

## ON MOTION OF DEFENDANT DEPARTMENT OF ENERGY TO DISMISS AS TO IT OR, IN THE ALTERNATIVE, TO BE DROPPED AS A PARTY

The court hereby adopts the following findings of fact and conclusions of law with respect to the motion of the Department of Energy to dismiss the complaint in the above-captioned action as to it or, in the alternative, to be dropped as a party:

*FINDINGS OF FACT*

(1) This action was commenced by plaintiff Naph-Sol Refining Company against defendant Cities Service Oil Company on September 15, 1976.

(2) In this action, plaintiff seeks to recover treble damages and attorneys' fees arising from alleged price overcharges on sales of motor gasoline by defendant Cities Service Oil Company to plaintiff at prices allegedly in excess of those permitted by the Mandatory Petroleum Price Regulations of the Department of Energy.

(3) On February 6, 1978, this court entered an order, pursuant to Rule 15(a) of the Federal Rules of Civil Procedure, granting plaintiff leave to file an amended complaint adding James R. Schlesinger, the then Secretary of Energy, as a party defendant.

(4) On April 24, 1978, defendant Schlesinger filed his answer.

(5) On December 19, 1979, the Department of Energy finally adopted the Proposed Consent Order entered into on October 30, 1979 by the Department of Energy and Cities Service. In that Order the Department of Energy agrees that Cities Service's "determinations . . . of its classes of purchaser for gasoline . . . are correct." 44 Fed.Reg. 75233 (Dec. 19, 1979).

(6) Cities' Objections to Plaintiff's Proposed Findings of Facts and Conclusions of Law on Plaintiff's Motion for Partial Summary Judgment were based largely upon its view that the Department of Energy had made a finding that its classes of purchaser were correct.

(7) A dispute has arisen concerning the scope and validity of the December 19, 1979 Order.

*CONCLUSIONS OF LAW*

■ (1) In *Dyke v. Gulf Oil Corporation*, 601 F.2d 557 (T.E.C.A.1979), the Temporary Emergency Court of Appeals held that while ordinarily the Department of Energy may not be joined as a party to actions brought under Section 210 of the Economic Stabilization Act, there were two exceptions to that general rule. Both exceptions are present in this case.

(2) The first exception established by *Dyke* is where the validity of an agency order is at issue. The court concludes that the validity of the December 19, 1979 Order is at issue in the action and that the presence of the Department of Energy as party defendant is necessary and proper.

(3) The second exception established by *Dyke* is where "compelling circumstances" warrant the joinder of the Department of Energy as a party. The court finds that the controversy surrounding the interpretation of the December 19, 1979 Order constitutes a compelling circumstance which requires the court to exercise its discretion to retain the Department of Energy as a party defendant in this action.

The court concludes that denial of the Department of Energy's motion to be dropped as a party does not involve a controlling question of law as to which there is a substantial ground for difference of opinion.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED, that the motion of defendant Department of Energy to dismiss this action as to it, or in the alternative, to be dropped as a party, is hereby denied.