**AMERICAN NURSING HOME ASSOCI-ATION, Plaintiff-Appellee,**

**v.**

**The COST OF LIVING COUNCIL et al., Defendants-Appellants.**

**Nos. DC–21, DC–22.**

Temporary Emergency Court of Appeals.

April 29, 1974.

As Modified May 15, 1974.

Supplemental Order May 21, 1974.

---

John N. Hanson, Atty., Dept. of Justice, Washington, D. C., with whom Irving Jaffe, Acting Asst. Atty. Gen., William E. Nelson, Stanley D. Rose, Attys., Dept. of Justice, were on the brief for appellants.

Thomas C. Fox, Washington, D. C., with whom William A. Geoghegan and George R. Clark; Pierson, Ball & Dowd, Washington, D. C., were on the brief for appellee.

Before TAMM, Chief Judge, and ANDERSON and ESTES, Judges.

ROBERT P. ANDERSON, Judge:

The Cost of Living Council (CLC) and its members, defendants below, appeal, under § 211 of the Economic Stabilization Act of 1970, as amended ("the Act"), from a judgment entered by the District Court for the District of Columbia on February 7, 1974,[1] declaring CLC

---

1. The plaintiff brought its action on September 17, 1973, seeking a declaratory judgment and injunctive relief against CLC's enforcement of Phase IV regulations on the grounds,

regulations, as applied to nursing homes, arbitrary and capricious and in conflict with the reimbursement provisions for Medicare and Medicaid under the Social Security Act, and permanently enjoining CLC from enforcing the regulations against nursing homes. We reverse.

In order to give context to the issues raised on this appeal, brief summaries of the history of the regulations in question and of the relevant portions of the Social Security Act are of assistance. On December 29, 1971, the CLC issued regulations covering institutional providers of health services, including nursing homes. 6 C.F.R. § 300.18 (Phase II). With various exemptions and refinements, these regulations generally limited price increases to those justified by increased costs, but only to the extent that such increases did not raise the provider's total annual revenues, adjusted for volume differences, by more than 6% above the level of the preceding year. Thereafter the regulations went through several recodifications, but without substantial change.[2] On January 21, 1974, new regulations were issued in implementation of Phase IV of the Act.[3] In general they imposed a 6.-5% ceiling on the annual increase in average revenues of establishments providing some kind of health care. While these new regulations eliminated the re-

quirement of cost justification, they provided more flexible exceptions.

In 1965, Congress had added to the Social Security Act, Title XVIII ("Medicare", 42 U.S.C. § 1395 et seq.) and Title XIX ("Medicaid", 42 U.S.C. § 1396 et seq.). Medicare established a federal health insurance program under the supervision of the Secretary of the Department of Health, Education and Welfare (HEW) to provide medical care for the aged. Payments to nursing homes, and other health providers, for services covered by the program were based upon the reasonable cost of such services, as implemented by an agreement between the Secretary and the nursing home. Medicaid provided grants to the states to aid their programs designed to furnish medical assistance to those in need of it. The amount of payment to a participating nursing home, or other health provider, was to be determined by the state, though the Secretary first recommended, and then required by regulation, that payments under Medicaid could not exceed the reasonable cost reimbursement for comparable services under Medicare. Among amendments to the Social Security Act affecting reimbursements under these programs were those in 1972 which, *inter alia*, included a provision requiring states to use the Medicare reasonable cost reimbursement

---

among others, that, as applied to nursing homes, they were arbitrary and capricious and in conflict with the reimbursement standards of Titles 18 and 19 of the Social Security Act. The defendant (CLC) filed a motion to dismiss and on December 5, 1973, after a hearing, the district court gave judgment for the plaintiff, granted a permanent injunction and dismissed CLC's motion. CLC moved for a stay and reconsideration after the presentation of further evidence. This was granted on December 28, 1973 and the judgment of December 5th was amended to make the injunctive relief temporary rather than permanent. On January 4, 1974 CLC filed a notice of appeal from the December 5 and December 28 judgment and order, and the case was docketed on appeal as DC–21.

This court on motion of CLC granted a further stay pending the additional proceedings in the district court. On January 21, 1974 new Phase IV regulations concerning

nursing homes were promulgated. The plaintiff moved the district court for leave to file a supplemental complaint challenging the new regulations. The court granted the motion on January 30, 1974; and, after giving the case further consideration, it entered a judgment granting the plaintiff a permanent injunction against the enforcement of the regulations against the plaintiff's members by CLC, which on February 10, 1974 filed its notice of appeal from this judgment. It was docketed in this court as No. DC–22. On the same day this court consolidated Nos. DC–21 and DC–22, and denied CLC's motion for a further stay.

2. In 6 C.F.R. § 130.61, 38 F.R. 1479, Jan. 11, 1973 (Phase III); then 6 C.F.R. Part 150, 38 F.R. 21978, Aug. 15, 1973.

3. 6 C.F.R. §§ 150.769–150.787, 39 F.R. 2670, Jan. 23, 1974.

approach in Medicaid programs, effective July 1, 1976 (42 U.S.C. § 1396a(a)(13)(E)), and those of 1973, including a repeal of another section (§ 225) of the 1972 amendments, (42 U.S.C. § 1396b(j)), which had imposed a 5% anti-inflation limitation on increases in federal participation in payment for skilled and intermediate care facilities.

The CLC's appeals, docketed as DC–21 and DC–22 and consolidated by this court on February 10, 1974, raise issues applicable to all of the CLC regulations, promulgated and amended from time to time under Phases II, III and IV.

Before reaching the merits of the two reasons advanced by the district court for finding these regulations invalid as applied to nursing homes, it is necessary to dispose briefly of certain preliminary contentions of the CLC.

 The defendants first assert that American Nursing Home Ass'n (ANHA) had no standing to bring its suit because it failed to allege injury to itself and because it was not a "person suffering legal wrong" within the meaning of § 210(a) of the Act. But the Association made specific allegations of injury to its members, 7,000 nursing homes deriving approximately 75% of their revenues from Medicare and Medicaid reimbursements and suffering adverse effects from defendants' regulations on the level of permissible reimbursements. Under these circumstances, standing is present. Sierra Club v. Morton, 405 U.S. 727, 737, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1971); United States v. Scrap, 412 U.S. 669, 685, 687, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1972). The words "person suffering legal wrong" do

not in themselves impose a more stringent test of standing, but rather are used in the context of requiring that any suit brought under the Act, must be for redress of a legal wrong that is the result of an act or practice arising under the Act, or an order or regulation issued pursuant thereto.

 CLC also contends that the complaint does not present a justiciable controversy, because the 7,000 members embody an "infinite variety of dissimilarities." But this constituted no bar to prevent the district court from addressing issues not dependent on the individual circumstances of each nursing home, such as the two it was asked to, and did, decide, i. e. the claimed conflict of the regulations with the intent and purpose underlying the congressional enactments, and their alleged arbitrary and capricious nature.

Finally, CLC objects that ANHA did not exhaust its administrative remedies. There is some confusion in the factual premise for this contention, between individual exceptions and industry-wide exemptions, and whether the latter were properly requested.[4] Nevertheless, all are agreed that no final CLC decision was reached before the plaintiff brought its district court suit, and the question thus posed is whether that circumstance should have prevented the district court from hearing the case.

The reasoning of the district court in concluding that it should hear and decide the two issues is stated as follows:

"The Court can interpret and rule on this conflict between regulation and statute as cogently as the agency and

---

4. The CLC appears to insist that ANHA's individual members must seek individual exceptions, but this concept is unsuited to industry-wide issues best handled under the exemption procedures. The district court mentioned the fact that the plaintiff had sought an exemption, saying, "[p]laintiff availed itself of this opportunity on March 30, 1973, by filing for such an exemption under the then existing Phase III regulations." Although the letter of March 30 was addressed to Dr. Dunlop,

as Director of the CLC, the regulations at the time required an exemption request to be filed with the district office of the Internal Revenue Service unless the CLC agreed to accept a direct filing. See 6 C.F.R. § 105.30 (a) (37 F.R. 10939, June 1, 1972), and § 401.-302 (37 F.R. 1010, Jan. 21, 1972). There is no claim that such permission was ever granted. The plaintiff's petition, however, is still pending.

therefore the Court does not feel constrained to dismiss the complaint for failure to exhaust administrative remedies. If this were a matter where agency expertise was required or the plaintiff was trying to short-circuit the administrative process and an administrative record would be of benefit, the Court would hold differently."

While this is a correct statement of the rule to be applied in passing upon the exhaustion requirement, the district court used it correctly only for the statutory construction issue and not for the question of whether the regulations were arbitrary and capricious.

■ The exhaustion doctrine is a practical one designed to increase both judicial and administrative efficiency. The most important factor in its application is, therefore, the one stated by the district court, whether "an administrative record would be of benefit" to proper resolution of the issues in controversy. This court, when considering the exhaustion requirement, has consistently stressed the importance of distinguishing between factual issues, upon which administrative expertise is best brought to bear, and legal issues, which courts are equally well equipped to handle. In City of New York v. New York Telephone Co., 468 F.2d 1401 (TECA 1972), we upheld dismissal of a complaint for failure to exhaust administrative relief, emphasizing that "[j]udicial review is surely hindered by the failure of the litigant to give the agency an opportunity to make a factual record, exercise its discretion or apply its expertise," *id.*, at 1403. We there relied on McKart v. United States, 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), which had stressed the desirability of letting "the agency develop the necessary factual background upon which decisions should be based," *id.*, at 194, and explicitly distinguished cases "solely of statutory interpretation" from those involving "expertise or the exercise of discretion," *id.*, at 197–198. Similarly in Anderson v. Dunlop, 485 F.2d 666 (TECA 1973), we

insisted upon exhaustion where the gist of plaintiffs' complaint was that the application of certain regulations to them was "arbitrary and capricious," *id.*, at 667. Finally, in Consumers Union v. Cost of Living Council, 491 F.2d 1396 (TECA 1974), we gave recognition to the exhaustion requirement but distinguished the case because there were no factual issues in dispute, and only a legal question remained concerning the interpretation of the validity of certain regulations in the light of the Economic Stabilization Act.

■ In this case, the district court in its final decision of February 7, 1974, 372 F.Supp. 517, did not express any adverse criticism of the record before it with regard to the statutory interpretation issue. But on the arbitrary and capricious question, it recognized that "[t]he determination of whether these regulations are arbitrary and capricious must rest upon a careful examination of the record as presented to this Court;" and it then pointed out the deficiencies of the record from the standpoint of its inadequacy in providing a "rational basis" for the regulations. The plaintiff-appellee takes the position that both issues are purely legal and that no factual issue remains in the case. The basis for the arbitrariness argument by the plaintiff and the finding to that effect by the district court was the disputed factual issue of whether nursing homes were a particularly inflationary sector. There is no law versus fact ambiguity in this question. See generally Davis, Administrative Law, § 30.05 (1958). It is on the answer to this factual question that the rational basis test squarely rests. Under these circumstances, exhaustion should have been ordered.

In this connection we turn to the matter of burden of proof, which undercuts the entire factual issue. Upon careful consideration of the trial court's opinions of December 5, 1973 and February 7, 1974, we have concluded that it acted in reliance upon the principle that the burden of proof, thoughout the proceed-

ings, rested upon the defendants. For example, toward the end of the February 7th memorandum it said, ". . . the COLC must be able to show, and refute evidence to the contrary, that they are not acting on a conclusory basis unsupported by fact that an industry is inflationary," and again ". . . the government has failed to show a rational basis for these regulations and, therefore, this court can only find there is substantial reason to adjudge them arbitrary and capricious."

As the district court (and for that matter the plaintiff as well) considered the arbitrariness issue to be whether the CLC "has a rational basis to support its position that the [nursing home] industry is inflationary," the question on appeal is not, therefore, whether specific provisions of the regulations impose arbitrary and capricious requirements but whether there is an adequate basis to impose on the plaintiff any regulatory scheme at all. In finding no rational basis for regulating nursing homes along with other institutional providers of health services, the district court relied almost entirely on the failure of CLC to produce any reliable statistics relative to inflation in the nursing home industry as compared with the institutional health services industry as a whole.

■ In dealing with this issue the trial court erred in misplacing the burden of proof. In general the burden is

on the challenger of agency regulations to demonstrate that they are arbitrary and capricious. New York Foreign Freight Forwarders & Brokers Association v. Federal Maritime Commission, 337 F.2d 289, 295 (2 Cir. 1964), cert. den., 380 U.S. 910, 85 S.Ct. 893, 13 L. Ed.2d 797 (1965); United States v. Ekberg, 291 F.2d 913, 921 (8 Cir.), cert. den., 368 U.S. 920, 82 S.Ct. 242, 7 L.Ed. 2d 135 (1961); American Export Lines, Inc. v. Dredge Admiral, 254 F.Supp. 1, 8, n. 8 (S.D.N.Y.1966). The same principle has been recognized by this court as applicable to actions by the CLC. Murphy v. O'Brien, 485 F.2d 671, 674 (TECA 1973).[5] See also Pacific Coast Meat Jobbers Ass'n, Inc. v. Cost of Living Council, 481 F.2d 1388 (TECA 1973); Western States Meat Packers Ass'n, Inc. v. Dunlop, 482 F.2d 1401 (TECA 1973); League of Voluntary Hospitals and Homes of New York, et al. v. Local 1199, Drug and H. U., 490 F.2d 1398, 1403 (fn. 3) (TECA 1973).

■ There is nothing on the face of the regulation to indicate that it is arbitrary or capricious. The lumping of nursing homes in the same regulatory category with hospitals is certainly not bizarre. They both require the services of doctors, nurses, technicians, housekeepers, cooks and other similar classes of employees. They both require food supplies, fuel, similar kinds of furniture and furnishings and other like items of equipment and consumables. The CLC

---

5. No argument has been advanced in this case that 5 U.S.C. § 556(d), which provides that "the proponent of a rule or order has the burden of proof," changes these general principles for the purpose of this case and places the burden on the CLC. In any event, this construction of the provision would have to be rejected because of the holding of the Supreme Court in American Trucking Associations v. United States, 344 U.S. 298, 318–320, 73 S.Ct. 307, 97 L.Ed. 337 (1953). That case held that the provision does not apply if the governing statutes of the agency do not require rules to be made on the record after opportunity for an agency hearing, because of the interaction of 5 U.S.C. §§ 556(a), 553(c), and 554(a). Here the provisions of the Economic Stabilization Act of 1970, as amended do

not impose any such requirements on the issuance of regulations. See § 203 of the Act. Indeed, § 207(b) shows that the emergency nature of the legislation and the aim of increasing the speed of administrative action resulted in a statutory scheme which relied substantially on hearings *after* the promulgation of regulations for those aggrieved. See United States v. Florida East Coast R. Co., 410 U.S. 224, 234, 93 S.Ct. 810, 35 L.Ed. 2d 223 (1973); United States v. Allegheny-Ludlum Steel Corp., 406 U.S. 742, 756–757, 92 S.Ct. 1941, 32 L.Ed.2d 453 (1972).

Moreover § 207(a) of the Act explicitly excludes the operation of 5 U.S.C. § 556 from functions exercised under the Economic Stabilization Act.

cannot be expected to subdivide designated inflationary sectors and create specialized regulations calibrated to fit the precise characteristics of small, slightly differentiated units at the insistance of every plaintiff. For the purpose of issuing and administering regulations under the Act, the CLC had only a duty to designate sectors made up of units which were reasonably similar in their economic attributes, purposes and functions. Where a particular unit or number of units, including an entire industry, did not produce the inflationary impact which the regulations were designed to stem, its remedy lay in the flexible provisions affording the right to petition CLC for exceptions or exemptions.

■ The CLC said that there was "no evidence to indicate that the rate of inflation in this area was substantially different from that experienced in the health care industry as a whole." If this is incorrect and there are factors which show that nursing homes should be exempt or separately regulated, it is up to the plaintiff to prove that this is so. As the record stands there is no substantial evidence to show that the alleged differences exist.

There is, however, evidence that each major type of institutional health provider has "comparable cost components in approximately equal magnitude," suggesting the likelihood that the inflation noticed as to all might well apply to each; and that these costs, labor and nonlabor, arise out of supply conditions in basically the same markets for each

type of provider. While this evidence is indirect, when combined with the total lack of evidence to show that there was no inflation in the nursing home field, it is enough to satisfy the rational basis test.

Under the circumstances a remand for exhaustion of administrative remedies is called for.

■ The remaining issue is whether the regulations of the CLC improperly conflict with the reasonable cost reimbursement provisions of the Medicare and Medicaid sections of the Social Security Act; and the answer to this is to be found in congressional intent and statutory interpretation. We agree with the CLC's position that the only conflict between the regulations and the pertinent portion of the Social Security Act is that which Congress intended.

There are two fundamental conceptual errors which manifest themselves in the analysis of what evidence was presented by the ANHA and reflected in the trial court's opinion. The first is the failure to distinguish temporary legislation designed to meet the economy-wide problem of inflation on a short-run basis, such as the Economic Stabilization Act, and, second, more permanent legislation designed to address specific problems of an often long-term nature in various segments of the nation, such as health programs for the medically needy.

Controls of the first kind do not necessarily conflict with legislative schemes of the second type simply because they may impinge or overlap the same sectors of the economy.[6] The second error in-

6. It is of interest that Charles C. Edwards, Assistant Secretary in HEW responsible for the policy development of Medicare and Medicaid programs, in an affidavit submitted to the district court found no conflict in either theory or practice between the health services cost reimbursement scheme and anti-inflation controls. On the contrary, he pointed out that " . . . it has been the Department's experience that it has little or no capacity to regulate the cost of personal health care under [its] programs and authorities." Since in particular "the Medicare program provides little or no basis for controlling inflation"

(in fact encouraging, by reimbursement, increases in the level of health care costs), and since Medicaid similarly "failed to limit any but the most unreasonable increases in health care costs," HEW "has in recent years relied, in the planning and administration of the Medicare and Medicaid programs, upon the price control regulations pertaining to providers of health services issued under the Economic Stabilization Act . . . ." In short, it was Mr. Edwards' considered judgment that far from interfering with the Medicare and Medicaid programs, "the Cost of Living Council's health care regulations

volves the interpretation of legislative action where an assumption of congressional awareness or unawareness is necessary to such interpretation. If there is no evidence in either direction, the presumption must be in favor of congressional awareness. The factors on which the district court based its conclusion that there was a conflict between the CLC regulations and the Medicare and Medicaid portions of the Social Security Act did not include consideration of these basic concepts.[7]

The only reason advanced in the December 5, 1973, decision was that Medicare and Medicaid programs are already "so strictly controlled by audit and governmental review." But that ignores the separate purposes of the federal medical cost reimbursement and economic controls programs. In the later decision of February 7, the district court recognized that the purpose of the Medicare and Medicaid controls was to make sure nursing homes got only "reasonable costs" and not "unwarranted reimbursement from the government." By contrast, the CLC regulations have an anti-inflationary purpose. In their original form, for example, they imposed an overall limit on the volume-adjusted revenues, beyond cost justification requirements, and in the latest version, eliminated cost justification altogether. There are different controls here, imposed for different purposes and for different periods of time. While preventing excessive demands on the governmental fiscal resources under the Social Security Act may indeed have anti-inflationary tendencies, it can hardly be supposed, absent explicit congressional direction to that effect, that inflation in a given sector of the economy is to be attacked, not by means of the Economic Stabilization Act, but only by preventing such demands.

The first reason for holding there is a fatal conflict between the regulations and the Social Security statutes, advanced by the trial court in its February 7 opinion, was said to be the very language of the Medicare-Medicaid reimbursement provisions, but this is just a repetition, in different guise, of the same rationale as that in the December 5 decision, because all that these provisions say is that reimbursement shall not exceed reasonable cost, as defined therein and by regulations. 42 U.S.C. §§ 1395f(b) and 1395x(v). They nowhere suggest that if an anti-inflation effort demands additional controls, these cannot be imposed.

The next reason advanced is based on § 203(j) of the Economic Stabilization Act, which provides:

"Nothing in this title may be construed to authorize or require the withholding or reservation of any obligational authority provided by law or of any funds appropriated under such authority."

The legislative history shows that § 203(j) was directed at preventing the impoundment of appropriated funds by the office of the President. Senate Report No. 93–63, U.S.Code Cong. & Admin.News, 93rd Cong., 1st Sess., at 1299. In this context, "terminations of programs legislated by the Congress" should be interpreted as action of greater direct impact than the regulations at issue here, which still provide for substantial federal reimbursements—and seek to curtail them only to the extent that they are inflationary. Moreover, if Congress, in enacting § 203(j), was trying to note its displeasure with the effect of CLC's regulations, it chose a singularly inept means by which to express that dissatisfaction.

The district court next considered the statement by Congressman Wilbur Mills,

. . . rather complement and support their efficient administration."

7. There is also the need to recognize, in dealing with the statutory interpretation as opposed to the arbitrariness issue, the full

breadth of the plaintiff's argument. The reasoning is not limited to nursing homes but includes hospitals and all other institutional providers of health services affected by both economic controls and the Medicare and Medicaid reimbursement provisions.

as House manager of a bill repealing § 225, 42 U.S.C. § 1396b(j):

> "The final medicaid provision in the Senate amendment would delete a provision in the present law which limits the average per diem costs for skilled nursing facilities and intermediate care facilities to no more than 5 percent a year. The wage-price guidelines which apply to such institutions already perform the type of function intended by this provision and will no doubt continue to do so for some time." Cong.Rec., June 30, 1973, H. 5790.

It recognized that this statement pointed in the direction opposite to its own conclusion but stated that Congressman Mills did not have the matter before him in the context of statute versus regulations and that his statement, therefore, should carry no weight. We disagree with this interpretation. The trial court placed considerable reliance on the statements of Senator Williams, sponsor of the same repeal bill, who said, after mentioning the fact that the Medicaid regulations included cost controls: "The Cost of Living Council controls the rates nursing homes can charge to private patients." Cong.Rec., May 16, 1973, S.

9217.[8] The district court inferred from this a distinction between public and private patients in CLC controls. A more reasonable interpretation, given the context, is that Senator Williams was simply trying to show that the full gamut of nursing home services, including those for private patients, were covered by other controls, not that public patients were not covered by CLC regulations. The statement is thus easily reconcilable with that of Representative Mills. In any event, since the CLC regulations did apply to Medicaid and Medicare reimbursements, there is no reason to ascribe error or ignorance to Senator Williams when it is more natural and logical to suppose that he was in substance saying the same thing as the Congressman.[9]

The district court relied on the amendment to Title 42 U.S.C. § 1396a, enacted on October 30, 1972, to become effective in 1976, which adopted the extension of the reasonable cost reimbursement approach of the Medicare program for the reimbursement of skilled nursing and intermediate care facilities under Medicaid in 42 U.S.C. § 1396a(13)(E). This rationale again misses the distinction between legislation designed to com-

---

**8.** The affidavit of Charles C. Edwards of HEW, see fn. 6, *supra,* similarly explains why that Department did not oppose the repeal of § 225: " . . . it believed existing regulations under the Economic Stabilization Act would achieve the same objective."

**9.** On oral argument the parties, for the most part, limited their discussions of sources from which congressional intent might be inferred, to five particular actions taken by Congress in which, had it purposed or intended to do so, Congress had clear opportunities to exercise economic controls in the health services industry. It did not, however, do so.

By negative inference the defendants have claimed that Congress intended that the health providers should remain under the CLC regulations. The plaintiff claims the contrary. The five legislative acts are: (a) the enactment in October, 1972, of the Social Security Act amendments, P.L. 92–603; (b) the congressional debates on the extension and modification of the Economic Stabilization Act in early 1973; (c) the reenactment of the Economic Stabilization Act in April, 1973;

(d) the repeal of § 225 of the 1972 amendments to the Social Security Act in July, 1973; and (e) the amendment of § 233 of the 1972 Social Security amendments in December, 1973.

Indeed, it should be pointed out that ANHA's argument before this Court about the repeal of § 225, 42 U.S.C. § 1396b(j), is directly contradicted by the argument it presented to Congress on March 29, 1973, when it sought explicit statutory exemption from economic controls. It then argued that § 225 would have "a very extensive anti-inflationary impact" and that there was thus "a strong case . . . for discontinuation of wage and price controls throughout the nursing home industry." See, Hearings of the House Committee on Banking and Currency, 93rd Cong., 1st Sess., on H.R. 2099 and H.R. 6168, at 295–96. Yet ANHA now asserts, by way of a heading in its brief, that "There Is No Clear Evidence That Congress Was Aware Of And Approved The Nursing Home Price Regulations When It Repealed Section 225 . . . ."

bat inflation and that designed to protect federal funds, especially as the effective date of this provision is not until July 1, 1976, by which time the economic controls may no longer be in operation.

The declaration and judgment of the district court that the regulations issued by the Cost of Living Council, placing limits on the prices charged by health care providers, 6 C.F.R. § 300.18, as implemented and amended, are, as applied to nursing homes, arbitrary and capricious is reversed, and this issue is remanded to the Cost of Living Council for the purpose of exhaustion of administrative remedies based upon plaintiff's petition for an industry-wide exemption, filed March 30, 1973.

We hold that there is no conflict, other than what was intended by the Congress, between the above mentioned regulations of the CLC as they apply to nursing care homes and Titles XVIII and XIX of the Social Security Act and

the district court's declaratory judgment and its order for a permanent injunction are reversed and the injunction is forthwith dissolved.[10]

### SUPPLEMENTAL ORDER

In the light of the termination as of May 1, 1974, of mandatory controls under the Economic Stabilization Act of 1970, as amended, and the issuance of Executive Order No. 11,781 of May 6, 1974, this Court orders the Cost of Living Council, forthwith to make, file and record suitable findings, conclusions and a formal Order on the issue of whether the plaintiff-appellee, American Nursing Home Association, should be granted an industry-wide exemption from the regulations covering institutional providers of health services for the effective period of the regulations prior to May 1, 1974, and to give notice of such action to the parties to the suit pursuant to Section 207(a) of the Act.

---

10. This court is aware that the authority of the President, delegated to the Cost of Living Council, to make regulations and to issue and enforce orders with respect to the issues in this case will terminate on April 30, 1974 unless extended to a later date by congressional action.