The FORT PIERCE UTILITIES AU-THORITY OF the CITY OF FORT PIERCE et al., Plaintiffs,

v.

DEPARTMENT OF ENERGY et al., Defendants.

Civ. A. No. 80–1006.

United States District Court, District of Columbia.

Nov. 18, 1980.

Bonnie S. Blair, Cynthia S. Bogorad, Marta A. Manildi, Spiegel & McDiarmid, Washington, D. C., for plaintiffs.

Nancy C. Crisman, Janice A. Alperin, Dept. of Energy, Barbara Weller, Federal Energy Regulatory Commission, Washington, D. C., for defendants.

## OPINION

HAROLD H. GREENE, District Judge.

Plaintiffs who, as municipalities, are consumers of oil and oil products, are seeking the reversal of orders of the Department of Energy (DOE) which denied them the right to participate in overcharge proceedings pending in that department against seven major oil companies.[1] The action is before

---

1. The specific requests are that the Court vacate and reverse orders of DOE denying to

plaintiffs status as full participants in enforcement proceedings instituted by DOE against

the Court on motions for summary judgment by all the parties, and on motion to dismiss of the Federal Energy Regulatory Commission (FERC).[2] For the reasons stated below, the Court grants summary judgment to the plaintiffs.[3]

### I

Plaintiffs, known as "Public Systems," are nine municipalities (or related authorities) which own and operate electric systems for the benefit of their citizens or ratepayers. In the course of their business, they purchase oil or oil products for the generation of electricity (or they buy electricity on a wholesale basis from a generating utility that itself purchases oil or oil products).

On May 1, 1979, the Department of Energy's Office of Special Counsel for Compliance (OSC)[4] issued so–called Proposed Re-

medial Orders (PROs) to seven major crude oil producers,[5] charging them with price violations with respect to the sale of crude oil, amounting to 1.7 billion dollars worth of overcharges. On June 13, 1979, the Department of Energy's Office of Hearings and Appeals (OHA) published a notice in the Federal Register (44 F.R. 33952) advising persons wishing to participate in the proceedings to file appropriate requests. The nine members of Public Systems did file such requests the following month, but OHA denied them participation as a full party[6] allowing them only to file briefs on the appropriate remedy if and when a violation and the amount thereof had been established in the course of the proceedings. Upon a petition for reconsideration, OHA, in an order dated October 5, 1980, again denied party status to Public Systems, on a similar basis, without expanding upon its

---

companies charged with violations of the mandatory petroleum price regulations, 10 C.F.R., Part 212; that it issue a declaratory judgment that plaintiffs may participate as a full party in such proceedings; and that it issue a permanent injunction requiring DOE to grant plaintiffs full party status. In the alternative, plaintiffs ask that the Court vacate and reverse certain orders of the Federal Energy Regulatory Commission denying jurisdiction over plaintiffs' appeal of these DOE orders. A third count requesting relief in the nature of mandamus is not pressed by plaintiffs at this time, and is moot in any event, given the Court's decision on the other claims.

**2.** Plaintiffs originally moved for a preliminary injunction, but that motion has been superseded by their motion for summary judgment.

**3.** The complaint will be dismissed as to FERC.

**4.** OSC was established by DOE Interim Management Directive No. 4101, November 14, 1977,

> to be responsible for enforcement of the oil pricing and allocation regulations as they apply to 34 major refiners . . . [and] to conduct an accelerated audit, investigation and enforcement effort with respect to those refiners[.]

Delegation Order No. 0204–12, issued by the Administrator of the Economic Regulatory Administration to the Special Counsel for Compliance, further elaborates upon the duties of the OSC, directing them, *inter alia*, to

> initiate or cause to be initiated, and conduct or represent the Secretary of Energy in such administrative actions and/or legal proceedings, including appeals, as may be necessary in his judgment to remedy violations and to require the repayment of any identified overcharge to the customers affected by the same, or, as appropriate, to the Treasury of the United States.

Delegation Order No. 0204–12, p. 3 (November 10, 1977)

When OSC determines that a violation of the regulation has occurred, it may issue a Proposed Remedial Order, setting forth the relevant facts and law. 10 C.F.R. § 205.192. If the recipient files a Notice of Objection to the PRO under 10 C.F.R. § 205.193(a), an enforcement proceeding then takes place before the Office of Hearings and Appeals (OHA), an independent, quasi–judicial entity within DOE. Under Interim Directive No. 4101, OSC may be assigned primary responsibility for the conduct of such proceedings before OHA, as it was in the present case.

**5.** The companies involved are Atlantic Richfield Company (Case No. DRO–0193), Gulf Oil Corporation and Gulf Oil Exploration Company (DRO–0194), Marathon Oil Company Inc. (DRO–0195), Standard Oil Company of California and Chevron, USA (DRO–0196), Standard Oil Company of Ohio (DRO–0197), Standard Oil Company of Indiana and Amoco Production Company (DRO–0198) and Texaco, Inc. (DRO–0199).

**6.** They requested participation as a single party.

reasons for limiting the participation.[7] The October 5 order did, however, grant party status to the Exxon Corporation[8] in its capacity as a consumer or purchaser of crude oil.[9]

■ On November 5, 1979, Public Systems filed an appeal and a request for expedited relief from the OHA order with the Federal Energy Regulatory Commission. FERC rejected Public Systems' appeal on grounds of lack of jurisdiction under section 503 and 504 of the Department of Energy Organization Act, 42 U.S.C. §§ 7193 and 7194. The agency denied Public Systems' petition for rehearing on February 20, 1980, and this complaint[10] followed.[11]

## II

■ In this Circuit, at least, a person has a right to intervene in agency proceedings if he would have standing in court to challenge or enforce a final action resulting from such proceedings. *Koniag Inc., Village of Uyak v. Andrus*, 580 F.2d 601, 606 (D.C.Cir.1978); *Martin–Trigona v. Federal Reserve Board*, 509 F.2d 363 (D.C.Cir.1975); *National Welfare Rights Organization v. Finch*, 429 F.2d 725 (D.C.Cir.1970); *Office of Communication of the United Church of Christ v. FCC*, 359 F.2d 994, 1000 n. 8 (D.C.Cir.1966).[12] Thus, the basic determinant of the legality of the refusal of the Department of Energy to permit these plaintiffs to participate in the administra-

---

7. In the same order, OHA granted similar limited participation to Consumer Energy Council of America (CECA), explaining its determination as follows (October 5 order at p. 9):

Each of the seven proceedings involves a large number of complex legal and factual disputes, and extensive discovery is currently being conducted in each case. That discovery relates almost exclusively to substantive, non–remedial aspects of the PROs. CECA has not demonstrated why the interests of the consumers whom it represents require participation at this stage in the proceedings, which relates solely to a determination of whether the recipients of the PROs violated DOE price regulations in first sales or domestic crude oil. Therefore, any determination permitting CECA to intervene into the discovery process would inject unrelated issues that are likely to result in significant delays to the completion of discovery.

8. Technically Exxon's application for party status differed from that of Public Systems. In order to participate in the proceedings involving these oil overcharges, Exxon filed a "notice of objection" as a person who "would be aggrieved by issuance of the Proposed Remedial Order as a final order," § 205.193(a), whereas Public Systems filed a "request to participate" as a "person whose interest may be affected by the proceeding," § 205.194(b). However, the only distinction made by DOE in its pleadings and memoranda in this action to explain the discrepancy in treatment between Exxon and Public Systems is that the former buys some crude oil from the PRO recipients directly, while Public Systems are indirect purchasers of crude oil. Whatever may be the significance of that difference, the technical distinction under the regulations referred to above is irrelevant to the extent to which each should be allowed to participate in the overcharge proceedings.

9. Although the participation of Exxon was likewise limited to the remedy issue, that corporation was, as indicated, granted party status. There are significant differences between party and nonparty status. As a party, Exxon may move for discovery (10 C.F.R. § 205.198), request a hearing to present oral argument (10 C.F.R. § 205.199A), and be placed on the official service list (10 C.F.R. § 205.194(d)). As a non–party, Public Systems may not take advantage of any of these procedures.

10. Although FERC contends that it has no jurisdiction over an appeal of a DOE denial of intervention, and DOE likewise does not concede that FERC possesses this jurisdiction, neither defendant contests the jurisdiction of this Court to consider this action. See, *e. g.,* DOE's Answer to Amended Complaint, ¶ 9, admitting that jurisdiction lies under section 5 of the Emergency Petroleum Allocation Act, 15 U.S.C. § 754, and section 211 of the Economic Stabilization Act, 12 U.S.C. § 1904 note. A denial of a request to intervene is generally considered to be a final reviewable order in this Circuit, in that the action is dispositive as to the party which is seeking intervention. See *United States v. American Telephone and Telegraph Co.,* No. 80–1141 (D.C.Cir. September 16, 1980); *Interstate Broadcasting Co. v. United States,* 286 F.2d 539 (D.C.Cir.1960).

11. The administrative proceedings are estimated to last several years, and the complaint thus does not address a moot issue.

12. To the extent that the two standing rules are not entirely congruent, the right to intervene in an agency proceeding may well be broader than the right to judicial review of that proceeding. See *Koniag v. Andrus, supra,* 580 F. 2d at 606; *National Welfare Rights Organization, supra,* 429 F.2d at 732 n. 27.

tive overcharge proceedings is whether plaintiffs would have standing eventually to participate in court challenges to the decisions made at the conclusion of those proceedings. If they would have such standing, they may participate in the administrative proceedings themselves; if they would not, DOE acted properly in excluding them. These general rules have been held applicable even in those situations where standing for the purposes of judicial review of the agency action did not flow from any express statutory grant. *National Welfare Rights Organization, supra.* As the court there said (429 F.2d at 736),

> [t]he right of judicial review cannot be taken as fully realized . . . if appellants are excluded from participating in the proceeding to be reviewed."[13]

It is clear that under the standards set forth in decisions such as *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) and *Association of Data Processing Organizations v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), plaintiffs clearly would have standing to appeal final agency action in the oil overcharge proceedings, for they meet both of the traditional standing tests.

First. Public Systems have a substantial interest in the outcome of the DOE proceedings, in that actions by DOE could cause them or the consumers they represent the requisite "injury in fact." The Public Systems utilities themselves have been injured in their ability to compete with other electric utilities, with capabilities to generate electricity from fuels other than oil, to the extent that oil overcharges have occurred. Further, the 400,000 consumers in the municipalities served by Public Systems would have been injured by illegal oil overcharges, to the extent that they have occurred, by having had to pay higher electric bills.[14] Nor are these interests limited solely to the remedy stage, for the fair fashioning of a remedy can occur only if the underlying determination of liability takes the perspective of consumers into account. Indeed, since DOE and the oil companies have the authority at any time to settle the administrative proceedings,[15] the remedy interests of the consumers can effectively be protected only if they are allowed to participate also in the liability stage of the proceedings. See p. 1024 *infra.*

Second. Public Systems' interests in the proceedings fall "arguably within the zone of interests to be protected" by the relevant statutes. See *Sierra Club v. Morton, supra,* 405 U.S. at 733, 92 S.Ct. at 1365. The Emergency Petroleum Allocation Act (EPAA)[16] and the Department of Energy Organization Act (DOEOA)[17] were designed to foster a competitive market in the supply of energy, to maintain a viable system of public utilities to serve the public's energy needs, and to promote the interests and participation of consumers in national energy programs.[18]

---

**13.** See also, *Virginia Petroleum Jobbers Association v. Federal Power Commission,* 265 F.2d 364, 368 (D.C.Cir.1959).

**14.** Standing to intervene in or appeal from agency action has been granted both to members of the consuming public, see *Church of Christ v. FCC, supra,* at 1002, and to persons seeking to protect their competitive positions in danger of injury at the hands of the agency, see *Cascade Natural Gas v. El Paso Natural Gas,* 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967); *Philco Corp. v. FCC,* 257 F.2d 656 (D.C. Cir.1958).

**15.** This has not infrequently occurred in DOE's history.

**16.** 15 U.S.C. §§ 751 *et seq.* The act forms the basis for the mandatory petroleum price regulations.

**17.** 42 U.S.C. §§ 7101 *et seq.*

**18.** Section 4 of the EPAA, 15 U.S.C. § 753(b)(1)(B), states that regulations shall provide for

> maintenance of all public services (including facilities and services provided by municipally, cooperatively, or investor owned utilities or by any State or local government or authority, and including transportation facilities and services which serve the public at large)[.]

Section 102 of the DOEOA, 42 U.S.C. § 7112, mandates the Department of Energy

> . . . (9) to promote the interests of consumers through the provision of an adequate and reliable supply of energy at the lowest reasonable cost;

■ In short, plaintiffs possess strong and concrete interests in the outcome of the oil overcharge proceedings, and their interests with respect thereto were intended to be within the scope of statutory protection. It follows that, in application of the tests established by the above–cited decisions, they would have standing in court to challenge a final agency action; hence they also have standing to participate in the agency proceedings.

DOE argues that, notwithstanding these general principles, Public Systems are precluded from intervening in the administrative process for a number of specific statutory and regulatory reasons. These will now be examined *seriatim*.

### III

DOE contends that any right to appeal Public Systems might otherwise have is precluded by statute. Section 503(a) of the DOEOA authorizes the Secretary to issue a remedial order to any person violating certain regulations; subsection (b) of the same section provides that such an order shall be deemed a final order, unreviewable by any court or agency (unless the person involved notifies the Secretary that he intends to contest it within thirty days); and subsection (c) provides for review of the remedial order by FERC should the recipient decide to contest it. 42 U.S.C. § 7193(a)–(c). From this scheme, DOE concludes that the only party entitled to appeal a DOE action concerning a remedial order is the person or entity to whom the order is issued, and that, since no order has been issued to plaintiffs, they have no right to appeal.

■ The flaw in this argument is that it would reverse what is the presumption that in effect arises from the general standing

doctrine discussed in Part II *supra*. The law is not that a person with standing has a right to review only if relevant statutes additionally and explicitly grant him such right. To the contrary, if a person has standing under the *Association of Data Processing Organizations* test, he is deemed to have a right to judicial review unless a statute denies him that right either in express terms or by necessary implication from the legislative history. As will be seen *infra*, the statutes upon which DOE relies can at best be said to be silent on the judicial review issue insofar as it may affect consumers; they do not affirmatively deny such review rights.

In the *National Welfare Rights Organization* case, · *supra*, organizations of welfare recipients requested status as parties in hearings which the Department of Health, Education and Welfare held to determine whether certain state welfare laws conformed with the Social Security Act. The Act specifically provided for judicial review only at the behest of "any state which is dissatisfied with a final act of the Secretary" (42 U.S.C. § 1316(a)(3)), and it was argued that this language necessarily excluded review rights of all others, including welfare recipients. But the court held to the contrary. In its view, when a plaintiff meets the tests set forth in *Association of Data Processing Organizations v. FCC, supra,* he has the right to judicial review of HEW action (and thus a right to intervene in the hearings) unless "Congress has in express or implied terms precluded judicial review" so as to exclude him. 429 F.2d at 735. Finding no express language in the Social Security Act prohibiting review, and no implied prohibition in the legislative history,[19] it concluded that the plaintiff wel-

---

... (12) to foster and assure competition among parties engaged in the supply of energy and fuels;
... (15) to provide for, encourage, and assist public participation in the development and enforcement of national energy programs;
... (17) to foster insofar as possible the continued good health of the Nation's small business firms, public utility districts, municipal utilities and private cooperatives involved in

energy production, transportation, research, development, demonstration, marketing, and merchandising[.]

**19.** The Court applied the "non–reviewability" test contained in *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), reasoning that it would not be presumed that Congress gave review standing to the states but denied it to the welfare recipients unless a showing of "clear and con-

fare recipients had a right to judicial review.

Section 503 of the DOEOA, which outlines the procedure by which a recipient of a remedial order may pursue an appeal to FERC[20] does not refer, one way or the other, to the rights of consumers affected by an enforcement proceeding to appeal from its outcome. To put it another way, here, as in *National Welfare Rights Organization*, there is no language in the relevant statute expressly prohibiting consumers from seeking review.

As concerns the legislative history of the DOEOA, the only major reference to the appeal provisions of the statute is a statement Representative Eckhardt made at the time he introduced the amendment that eventually, with minimal changes, became section 503. He gave as his reason for offering the amendment that under the governing provisions of the Economic Stabilization Act

> there is no procedure by which a person ordered to comply with a rule or regulation by a remedial order can get a hearing before the agency. It cannot get a hearing now before the FEA and under this bill there is no procedure for a hearing before the Department.
>
> What this [amendment] would do is give a person against whom a remedial order is issues [sic] a right to a hearing before the agency.
>
> I think it merely affords minimal due process. . . .

123 Cong.Rec. 17402 (June 3, 1977).

To decide whether this meager legislative history supplies the requisite "clear and convincing evidence" of an implied prohibition upon consumers seeking review of DOE actions (see note 19, *supra*), the Court takes guidance from *National Welfare Rights Organization, supra* and *Consumer Federation of America v. Federal Trade Commission*, 515 F.2d 367 (D.C.Cir.1975).

In the former case, the legislative history showed that Congress explicitly granted review rights to the states on the theory that this would strengthen federalism. No mention was made of the rights of any other entity or person to obtain review of HEW orders. On that basis, the court concluded that (429 F.2d at 736):

> [c]learly, it is not contrary to that purpose that welfare recipients also have standing to seek review. The fact that the statute in question explicitly gave judicial review to the states and said nothing about welfare recipients is not "clear and convincing evidence" that Congress intended to deny review to the primary beneficiaries under the statute.

In *Consumer Federation of America*, on the other hand, the court took note of the fact that an amendment to the review provisions of the Federal Trade Commission Act[21] expressly permitting review at the behest of persons other than those subject to an FTC order was rejected by the Senate after extensive debate, in favor of the more limited review provision ultimately embodied in the statute. 515 F.2d at 372. On the basis of that specific history the court found "clear and convincing evidence of a legislative intent to allow review of FTC cease and desist orders only on the petition of parties subject to the orders." 515 F.2d at 370.

■ The legislative history of the DOEOA obviously presents a situation far more analogous to that involved in *National Welfare Rights Organization* than to that of *Consumer Federation of America*. Congress never did consider and reject an alternative to section 503 giving standing to consumer groups; rather, it simply never considered and thus never decided the question of whether persons other than recipients of remedial orders would have the right of review before FERC. This silence, as in *National Welfare Rights*, does not constitute the "clear and convincing" evi-

---

vincing evidence" of such intent were made. 429 F.2d at 735.

**20.** The Court here adopts, without so deciding, DOE's assumption that a person precluded

from obtaining review before FERC would be similarly limited with respect to judicial review.

**21.** The Act allows the recipient of an FTC cease and desist order to obtain review thereof.

dence necessary to support the existence of an implied prohibition of review on consumers' behalf.[22]

## IV

This conclusion is buttressed by evidence in the legislative and administrative history of the DOEOA. That Act clearly indicates that the right to judicial review of agency action established in the Economic Stabilization Act[23] (made applicable to FEA actions under the Mandatory Petroleum Price Regulations by the Emergency Petroleum Allocation Act),[24] was intended to be preserved.[25]

Section 502(a) of the DOEOA, 42 U.S.C. § 7192(a) provides that

[j]udicial review of agency action taken under any law the functions of which are vested by law in, or transferred or delegated to the Secretary, the Commission or any officer, employee, or component of the Department shall, notwithstanding such vesting, transfer, or delegation, be made in the manner specified in or for such law.[26]

The Economic Stabilization Act, the review provisions of which were adopted for the FEA by the Emergency Petroleum Allocation Act and thus were transferred to DOE by section 301 of the DOEOA (42 U.S.C. § 7151), specifies how judicial review as contemplated by DOEOA section 502(a) was to be implemented, by providing in section 211 that

(a) The district courts of the United States shall have exclusive original jurisdiction of cases or controversies arising under this title, or under regulations or orders issued thereunder, notwithstanding the amount in controversy[.]

Although on its face this section appears to be purely a jurisdictional one bearing no relation to standing to appeal agency action, the Temporary Court of Emergency Appeals has held it to be the proper vehicle for challenging the validity of agency actions. See *McCulloch Gas Processing v. Canadian Hidrogas Resources Ltd.*, 577 F.2d 712, 718 n. 13 (Em.App.1978) (§ 211 "provides the proper avenue for relief against the United States" by person alleging they suffered a legal wrong due to orders by the FEA); *Griffin v. United States*, 537 F.2d 1130 (Em.App.1976) (§§ 210 and 211 provide right to appeal for party alleging 5th amendment taking under pricing regulations and asking damages); see also *American Nursing Home Association v. Cost of Living Council*, 497 F.2d 909 (Em.App.1974). It is also interesting to note in this connection that the Senate Committee report on that Act states that, among the principles underlying section 211, was the provision of relief for "persons aggrieved by the opera-

---

**22.** This conclusion is reinforced by the provisions of the DOEOA which emphasize the desirability of protecting consumer interests and of public participation in the enforcement of the national energy program. See, e. g., 42 U.S.C. § 7112. Such provisions place consumers in the posture of being "primary beneficiaries under the statute" much as welfare recipients are "primary beneficiaries" under the Social Security Act. See *National Welfare Rights Organization, supra*, 429 F.2d at 736.

**23.** 12 U.S.C. § 1904 note.

**24.** 15 U.S.C. § 754(a)(1) states that "sections 205 through 207 and sections 209 through 211 of the Economic Stabilization Act of 1970 . . . shall apply to the regulation promulgated under section 753(a) of this title [*i. e.*, the Mandatory Petroleum Price Regulations], to any order under this chapter, and to any action taken by the President (or his delegate) under this chapter, as if such regulation had been promulgated, such order had been issued, or such action had been taken under the Economic Stabilization Act of 1970." As seen below, section 211 of the Economic Stabilization Act is the provision governing judicial review.

**25.** Indeed, during the debates, it was emphasized that the bill which was to become the DOEOA did not constitute an attempt

to eliminate, reduce or restrict the rights of any party; not for private parties, public interest groups or a Government agency which presently might possess such a right.

123 Cong.Rec. 17266–17267 (June 2, 1977).

**26.** In introducing this language into the bill that would become the DOEOA, Representative Dingell noted that "[t]he Emergency Petroleum Allocation Act of 1973–EPAA–provides that the special judicial review provisions of the Economic Stabilization Act of 1970 apply to court review of oil pricing and allocation regulations." 123 Cong.Rec. 17321 (June 2, 1977).

tion of the program." S.Rep.No.92–507, November 20, 1971, p. 10. And, of course, the "person aggrieved" standard gives members of the consuming public standing to appeal final agency action.[27]

In short, it is clear that plaintiffs would have a right to judicial review of actions of the Department of Energy with respect to the current overcharge proceedings and that, following the *Koniag* line of decisions discussed *supra*, they therefore also have the right to participate in the administrative proceedings leading up to such review.[28]

### V

The government next contends that Public Systems should not be allowed to intervene in the agency proceeding because of the availability of a private cause of action against the oil companies. Specifically, reliance is placed upon section 210(a) of the Economic Stabilization Act, note 27 *supra*, which provides that a person "suffering legal wrong" may bring suit in federal court against a private wrongdoer. By suing the oil companies directly, it is claimed, Public Systems would have ample opportunity to vindicate the interests that they seek to protect through intervention in the administrative proceeding. Further, according to DOE, whenever administrative and private proceedings coexist–as in the antitrust and securities fields[29]–private complainants, like the municipalities comprising Public Systems, should not be and are not allowed to intervene in the administrative proceeding. These arguments are unpersuasive, for a number of different reasons.

First, unlike in the antitrust or securities areas, the enforcement scheme provided by the Department of Energy Organization Act specifically contemplates participation by the public in compliance proceedings. Under that Act, the Department of Energy is charged

> to provide for, encourage, and assist *public participation in the* development and *enforcement* of national energy programs. 42 U.S.C. § 7112(15) [emphasis added].

OHA is also charged with endeavoring "to insure that all interests are represented" in the enforcement proceedings, not merely the interests of those for whom a cause of action under section 210 would be unavailable. 44 F.R. 7923 (February 7, 1979). In

---

**27.** See, *e. g., Office of Communication of the United Church of Christ, supra,* 359 F.2d at 1001.

Plaintiffs claim that section 210(a) of the Economic Stabilization Act also grants the right to obtain review of DOE orders. Section 210(a) states that

[a]ny person suffering legal wrong because of any act or practice arising out of this title, or any order or regulation issued pursuant thereto, may bring an action in a district court of the United States . . . including an action for a declaratory judgment, writ of injunction . . . and/or damages.

On its face, this provision would appear to grant a right of appeal against DOE, and at least one older case held that section 210 provides standing to challenge agency orders, see *American Nursing Home Association v. Cost of Living Council, supra.* However, in *McCulloch Gas Processing v. Canadian Hidrogas Resources Ltd., supra,* the Temporary Court of Emergency Appeals has since found that Congress intended section 210 to provide only for private actions against private parties violating agency orders or regulations, as distinguished from suits against the government. Such suits, said the court, lie under section 211. 577 F.2d at 718 n. 13.

**28.** It is to be noted also that the Federal Energy Administration, DOE's predecessor, has held that associations representing the users of petroleum products do have the right to appeal before the Office of Exceptions and Appeals remedial orders directed at other parties. See, *e. g., Petrochemical Energy Group,* 3 FEA ⁇ 80,712 (October 20, 1975). If the Court were to adopt DOE's current interpretation of section 503, a right of appeal within the agency recognized by the agency prior to enactment of the DOEOA would be eliminated–an elimination which would be inconsistent with the *National Welfare Rights Organization* principle that such prohibitions on review should be implied only if Congress clearly so intended. See also 18 C.F.R. § 1.38, which provides very liberal standards for intervention in appeal proceedings before FERC.

**29.** For the antitrust scheme, see 15 U.S.C. §§ 4, 9, 15, 21, 1311–1314; for the SEC scheme see 15 U.S.C. §§ 77i, 77k, 77*l*, 77*o*, 77s, 77t, 77v, 78r, 78u, 78y, 78aa.

these respects, the Department of Energy scheme is thus clearly distinguishable from the dual enforcement structures under the antitrust and securities laws.

Second, judicial interpretation of the relationship between a section 210 private action and an administrative enforcement proceeding has never gone so far as to preclude the intervention of a private party in an enforcement proceeding on account of the availability of the private action. At best, the cases are neutral.[30] However, the Department of Energy itself has addressed this issue, and it has done so in a manner which squarely supports Public Systems' position. In *American Service Stations*, 1 DOE ¶ 82,510 (November 17, 1977), the Exxon Corporation asserted that American Service Stations should not be afforded an opportunity to participate in the agency's compliance proceedings. But DOE found

> no basis to accept Exxon's claim that American is limited to seeking relief by filing a private cause of action under Section 210 of the Economic Stabilization Act of 1970. In providing an aggrieved person with access to both administrative and judicial forums, Congress did not indicate an express or implied intent that the right to pursue a private cause of action under Section 210 should preclude participation by an aggrieved party in a compliance investigation conducted by the administrative agency that is charged with the responsibility of enforcing private regulations. 1 DOE ¶ 82,510, p. 85,-030 n. 3.[31]

Thus, the Department has seen fit previously to reject the very argument it now puts forward.

Third, Public Systems could not obtain the same protection for its interests in a private suit that it could gain by participation in the public proceeding. The two remedies are independent of each other and were designed to serve fundamentally different purposes. *Bulzan v. Atlantic Richfield Co., supra*, 620 F.2d at 282. The private action is concerned "with *punishing* a violator for his illegal conduct or with *compensating* a victim for his injuries" while the main purpose of administrative remedies, on the other hand, "is to insure, on a national scale, the *enforcement* of [DOE's administrative] regulations." 620 F.2d at 282 (quoting from Economic Regulatory Enforcement Manual, § 1.501.00) (emphasis added). Public Systems, as representatives of consumers, are concerned not only with obtaining redress for past overcharges, but also with insuring that the oil companies be forced to comply with DOE regulations in the future. A private damage action would at best indirectly afford protection of this interest.

Beyond that, even if a private action against the oil companies were to provide plaintiffs with an opportunity to protect consumer interests in the abstract, it would not do so in reality. Although a final DOE action in these overcharge proceedings would not have a totally preclusive effect on a subsequent private action, the "courts are required to give 'great deference' to all appropriate administrative interpretations of congressional statutes and their implementing regulations." *Bulzan v. Atlantic Richfield Co., supra*, 620 F.2d at 284. Thus, as a practical matter plaintiffs may well be bound by a DOE order in these proceed-

---

**30.** Of the cases relied upon by DOE, one involved the question of whether DOE must be joined as a party defendant in a section 210 action (*Dyke v. Gulf Oil Corp.*, 601 F.2d 557 (Em.App.1979)), and the other dealt with the question whether a party is entitled to bring a section 210 damages action when the violations underlying the action have already been the subject of a remedial order by the FEA (*Bulzan v. Atlantic Richfield Co.*, 620 F.2d 278 (Em. App.1980)). Neither addressed, directly or indirectly, the issue of private party intervention in a DOE enforcement proceeding.

**31.** See also *Bulzan v. Atlantic Richfield Co., supra*, 620 F.2d at 281, discussing congressional intent behind the dual enforcement scheme:

> Congress, by fashioning different administrative and private remedies into the ESA and EPAA, indicated that neither remedy was to be the exclusive recourse for a party who has suffered a legal wrong because of a violation of a FEA and DOE regulation.

ings[32] arrived at with little or no consumer input.[33] In such circumstances, the availability of a private cause of action would offer little sustenance to any interests ignored in the administrative proceedings.

The Court holds that the existence of a private action under section 210 of the Economic Stabilization Act does not preclude plaintiffs from intervening in the oil overcharge proceedings before DOE.

## VI

The government finally contends that the governing regulatory scheme leaves the decision as to who may intervene in agency proceedings to the discretion of the Office of Hearings and Appeals within DOE. In this regard, it refers to the regulations which provide that (10 C.F.R. § 205.194(c)):

> [a]fter considering the requests [to participate] submitted pursuant to [§ 205.-194(b)], the Office of Hearings and Appeals shall determine those persons who may participate on an active basis in the proceeding and the nature of their participation.

The Department further cites to the preamble to the regulations as published in the Federal Register, which states that (4 F.R. 7923 (February 7, 1979)):

> [i]n determining which requests to participate will be granted the Office of Hearings and Appeals will endeavor to ensure that all interests are represented without unduly delaying the proceeding through duplicative presentations.

In DOE's view, if Public Systems has a right to intervene as a full party, then all consumers and indirect purchasers of crude oil would have to be permitted to intervene, and such an onslaught would cause the "undue delay" to the proceedings envisioned in the preamble to the regulations. In addition, the argument is made that there is no need for consumer intervention because it is the function and purpose of the Office of Special Counsel for Compliance to represent the public interest in oil overcharge proceedings. It follows, according to DOE, that in limiting Public Systems' participation to submission of a brief on the remedy issue, OHA was properly exercising its discretion within the appropriate guidelines.

■ The Court reads the procedural guidelines differently. First, OHA is not directed to limit participation to avoid any type of delay, but only to avoid delay caused by "duplicative presentations." Yet here, because party status was denied to all requesting consumer groups (except Exxon, whose interests can hardly be said to parallel those of small municipal utilities), it is difficult to see whose presentation Public Systems would be duplicating. Moreover, the fact is that the hundreds of potential intervenors DOE envisions have not in fact materialized. Approximately nine consumer groups or representatives, including plaintiffs, have sought to intervene in this case. If participation by plaintiffs, or participation in that or future proceedings by additional individuals or groups would, in fact, threaten the proceedings with too much duplication, DOE is not without a remedy. Section 205.194(c) gives OHA the authority to require "participants with similar interests . . . to consolidate their submissions and to appear in the proceeding

---

**32.** See *Hodgson v. United Mine Workers*, 473 F.2d 118, 129 (D.C. Cir. 1972).

**33.** DOE claims that consumer input at the remedial stage would be sufficient. However, as indicated above, it is clear that DOE and the oil companies could decide to settle through a consent order before that stage is reached. If plaintiffs are able to participate as a party in the proceedings, not only would they be more aware of the imminence of settlement, but DOE would be more likely, and might even be required, to hear their comments on the sufficiency of the consent order. See *National Welfare*

*Rights Organization, supra,* 429 F.2d at 739; *Textile Workers Union of America v. NLRB,* 294 F.2d 738, 741 (D.C. Cir. 1961).

DOE has brought to the Court's attention one section 210 private action (*Naph–Sol Refining Co. v. Cities Service Oil Co.,* 495 F.Supp. 882 (W.D.Mich.)) in which as court has ruled contrary to a DOE consent order. That circumstance, however in no way changes the fact that plaintiffs' ability to protect its interests would be substantially diminished were they to be precluded from intervening in the present agency proceedings.

through a common representative." Instead of exercising this clear authority, DOE simply excluded all consumer interests from the proceedings.[34] This is contrary to DOE's own guidelines.

■ Second, DOE's assertion that the Office of Special Counsel sufficiently represents consumer interests is without support. The directive and delegation establishing OSC,[35] does not appear to charge the Office with the protection of the public interest or the interests of consumers;[36] rather, its duties are limited to ensuring compliance with agency regulations and taking appropriate enforcement action.[37] If OSC is not charged with representing consumer interests, then no one is doing so, and OHA is in violation of its mandate to "ensure that all interests are represented" at proceedings before it.[38]

Third, a number of decisions by DOE and its predecessor the Federal Energy Administration establish an agency policy to allow consumers of petroleum products to intervene as parties in agency proceedings even when their purchases were not directly from firms alleged to have violated DOE regulations. In the *State of New York* proceeding, 4 DOE ¶ 82,527 (August 8, 1979), the State of New York was allowed to intervene in enforcement proceedings against Ashland Oil Co. in order to protect the interests of the consumers it represents.

DOE described a "liberal policy towards intervention" adopted by the agency giving standing to consumers able to allege a concrete injury, and it went on to state that it could

> see no reason why standing to participate in agency proceedings should be limited to privately–controlled interests that purchased petroleum products directly from the party alleged to have committed a violation of DOE regulations. 4 DOE ¶ 82,527, p. 85,089.

Like Public Systems, the interest of New York related primarily to the form and amount of the remedy flowing from the overcharge proceeding, but DOE found that this "should not preclude the State from participating in the present stage of this enforcement proceeding." *Id.* Hence, the State was accorded the opportunity to participate at any evidentiary hearings and oral arguments in that case.[39] See also *Coastal States Gas Corp.*, 3 DOE ¶ 80,156 (April 30, 1979); *Air Transport Association of America*, 5 FEA ¶ 87,025 (March 18, 1977); *Consumers Union of United States*, 5 FEA ¶ 87,014 (February 18, 1977).

■ The law is well established that where an agency diverges from an established practice or policy, it is required to give a reasoned explanation for the difference in treatment. *Public Service Company of Indiana v. FERC*, 584 F.2d 1084, 1088

---

34. Except, as noted above, from the remedy stage which, depending upon DOE's rulings (or a possible compromise settlement) may or may not ever arrive.

35. Interim Management Directive 4101 and Delegation Order No. 0204–14, see note 4, *supra*.

36. Except for insuring that reimbursements are made to identified customers of oil companies after liability has already been established.

37. If OSC does indeed have the responsibility to represent consumer interests, as DOE claims, it is odd that OHA has felt it necessary to give party status to Exxon in its capacity as a consumer of crude oil. It is difficult to understand why OSC was thought capable of representing the substantial interests of consumers in general in these proceedings, running into the hundreds of millions of dollars, but incapable of representing Exxon's interests which

amount, in these proceedings at least, to less than $20,000.

38. In a letter of October 31, 1980 accompanying a copy of Delegation Order No. 0204–14 submitted by DOE to the Court, DOE drew to the Court's attention the fact that "this delegation charges the Special Counsel with the responsibility to remedy violations and require payment of overcharges, *but only as to identified 'customers affected' by violations of the regulations.*" (emphasis added). This statement belies DOE's assertions in its briefs that OSC has been delegated the responsibility to protect the broader interests of the public and consumers at large.

39. The State was not permitted to take discovery because it sought to intervene too late in the course of proceeding when discovery was already far advanced.

(D.C. Cir. 1978); *Boston Edison Co. v. FPC,* 557 F.2d 845 (D.C. Cir. 1977); *Greater Boston Television Corp. v. FCC,* 444 F.2d 841 (D.C. Cir. 1970). DOE gave no reasons whatever for its denial of party status to Public Systems in its order of October 5, 1979, and the reasons given for the exclusion of other consumer groups,[40] *supra,* are not only unacceptable given the Court's interpretation of the limits on DOE's discretion set forth above but are also inconsistent with DOE's actions in the *State of New York* line of decisions.

■ The Court holds that DOE improperly exercised its discretion under the regulations in denying full party status to Public Systems, and it further holds that Public Systems, having shown their standing to appeal agency orders issuing from the overcharge proceedings and the mandate of DOE to hear presentations from all interests (including consumers), are entitled to participate in proceedings as a full party.[41]

## VII

The proceeding now pending before the Department of Energy represents an administrative inquiry into alleged overcharges by a number of large oil companies involving hundreds of millions, if not billions, of dollars. To state that the consumers of oil and oil products have a stake in such proceedings is to state the obvious. The plaintiffs in this case, a number of municipalities engaged in the electric power business, sought to protect their interests and the interests of their citizens and their customers by attempting to intervene in the administrative proceedings and to present what facts they might be able to adduce that would bear on the overcharge issues. The Department of Energy's Office of Hearing and Appeals summarily denied their request although the Exxon Corporation was given intervention privileges on

the theory that it, unlike these plaintiffs, is a direct consumer of oil.

The myopia of the Department of Energy, in assigning a greater real interest in the proceedings to Exxon (because it has purchased $20,000 worth of oil from the other oil companies) than to genuine consumer representatives (who may or may not make purchases directly from these companies) is difficult to understand. In any event, the legal position of the Department is without merit. The Court is this date issuing a permanent injunction which will require the Department of Energy and its Office of Hearing Appeals forthwith to give to these plaintiffs the full rights of a party.[42]

---

**40.** See note 7 *supra.*

**41.** In view of the Court's decision on the principal issue, Count II (requesting the Court to order FERC to take jurisdiction over plaintiffs' appeal of DOE's orders denying intervention)

and Count III (requesting relief in the nature of mandamus) will be dismissed as moot.

**42.** Subject, of course, to the logistical qualifications contained in the preamble to the regulations (see p. 1025 *supra*).